James W. **KERR**, Plaintiff–Appellant,

v.

Catherine J. **FARREY** and Lloyd Lind, Defendants–Appellees.

No. 95–1843.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1996.

Decided Aug. 27, 1996.

Walter Stern, (argued), Union Grove, WI, for Plaintiff–Appellant.

Stephen J. Nicks, (argued), Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for Defendants–Appellees.

Before CUMMINGS, FLAUM, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The question presented in this case is whether a state correctional institution may require an inmate, upon pain of being rated a higher security risk and suffering adverse effects for parole eligibility, to attend a substance abuse counseling program with explicit religious content, consistent with the Establishment Clause of the First Amendment to the U.S. Constitution. Applying the test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the district court concluded that the prison program did not violate the Establishment Clause and

granted the defendants' motion for summary judgment. We find, to the contrary, that the state has impermissibly coerced inmates to participate in a religious program. We therefore reverse and remand for further proceedings.

## I

James W. Kerr, at the time this case arose, was an inmate at the Oakhill Correctional Institution, a minimum security facility in Oregon, Wisconsin. Catherine J. Farrey is the warden at Oakhill, and Lloyd Lind is the supervisor for Oakhill's Social Services Department. Oakhill requires inmates with chemical dependence problems, like Kerr, to observe Narcotics Anonymous ("NA") meetings as part of their rehabilitation program. According to Kerr, whose version of the facts we accept on this appeal from summary judgment, the penalty for nonattendance at NA meetings was a higher security risk classification and negative effects on parole eligibility. NA was the only substance abuse program available to the Oakhill inmates. Oakhill used it because of its demonstrated success with prison inmates and because it was free for both the institution and the inmates.

The NA brochure, which was part of the summary judgment record, sets forth the twelve-step program that lies at the heart of its treatment approach. These twelve steps, which we set forth in full, described the road to recovery that successful NA participants had followed:

1. We admitted that we were powerless over our addiction, that our lives had become unmanageable.

2. We came to believe that a power greater than ourselves could restore us to sanity.

3. We made a decision to turn our will and our lives over to the care of God as we understood Him.

4. We made a searching and fearless moral inventory of ourselves.

5. We admitted to God, to ourselves, and to another human being the exact nature of our wrongs.

6. We were entirely ready to have God remove all these defects of character.

7. We humbly asked Him to remove our shortcomings.

8. We made a list of all persons we had harmed, and became willing to make amends to them all.

9. We made direct amends to such people wherever possible, except when to do so would injure them or others.

10. We continued to take personal inventory, and when we were wrong promptly admitted it.

11. We sought through prayer and meditation to improve our conscious contact with God, as we understood Him, praying only for knowledge of His will for us, and the power to carry that out.

12. Having had a spiritual awakening as a result of those steps, we tried to carry this message to addicts and to practice these principles in all our affairs.

The parties do not dispute the fact that the NA meetings at Oakhill were organized around these principles.

Kerr asserted in an affidavit that he objected as soon as he was told by Alan Webb, the prison social worker assigned to his case, that he would be required to attend the NA meetings. His affidavit claimed that Webb told him that he "didn't have a choice in the matter; that attendance was mandatory; that if [he] didn't go, [he] would most likely be shipped off to a medium (i.e. higher security) prison, and denied the hope of parole." When Kerr first attended the NA meeting, he objected to dragging God's name into "this messy business of addictions," and he expressed his disagreement with the view of God that was propounded at the meeting. Kerr regarded NA's deterministic view of God to be in conflict with his own belief about free will; more generally, he found it offensive to his personal religious beliefs.

Warden Farrey confirmed in her affidavit that inmates were required to "observe" the NA meetings, although she stated that they were not required to "participate." She also conceded that "Narcotics Anonymous does use the concept of a 'higher being' in their

treatment approach." This concept, she went on to say, was viewed as a very personal matter and could range from a religious concept of God to the non-religious concept of individual willpower. Nevertheless, she confirmed that the NA program followed the twelve principles set forth above. Finally, she confirmed that refusal to attend recommended treatment programs like NA could have an adverse impact on an inmate's security risk rating and consideration for parole, although she asserted that no inmate had ever suffered the former penalty solely for refusing to participate in NA or in Alcoholics Anonymous, a similar program for alcoholics.

## II

On December 19, 1994, acting *pro se,* Kerr filed this suit under 42 U.S.C. § 1983, naming both Warden Farrey and Lind as defendants. He initially asked for an injunction preventing the prison officials from compelling himself and other inmates to attend NA meetings and from keeping records of attendance at those meetings. He also asked for unspecified compensatory and punitive damages. The district court allowed him to proceed *in forma pauperis.* On February 15, 1995, the defendants filed a motion for summary judgment, attaching Warden Farrey's affidavit and the NA brochure in support of the motion. Kerr responded on March 9, 1995. He asserted that the "flexible" spirituality that NA claimed did not reflect the actual operation of the program and that the NA approach was antithetical to his religious beliefs. He also stated that the Oakhill NA meetings always began with a prayer invoking the Lord and that all members were encouraged to read the NA book, which is similar to the AA "Big Book" and contains many references to spirituality and God. Finally, in the event his materials were deemed insufficient to defeat the summary judgment motion, he asked for 60 more days for further discovery. He attached excerpts from Rational Recovery, a non-spiritually based self-help substance abuse recovery program, and the AA Big Book, in addition to other materials, to his response. The defendants filed their reply on March 21, 1995, which added the argument that they were entitled to qualified immunity from suit.

The next day, March 22, 1995, the district court granted the defendants' motion. The court's order acknowledged that "Narcotics Anonymous uses the concept of a 'higher being' in its treatment approach." It accepted Warden Farrey's representation that the "higher being" concept could range from a religious view of God to the nonreligious concept of individual willpower (and thus implicitly rejected Kerr's evidence to the contrary). The court also found that inmates like Kerr were required to observe the NA meetings and that refusal to attend could have an adverse impact on an inmate's security risk rating and consideration for parole. Nevertheless, the court found no Establishment Clause violation. Following the three-part test of *Lemon,* the court concluded (without explanation) that the NA program had a secular purpose, that it neither advanced nor inhibited religion, and that there was no state entanglement "in terms of economic support." The court found support for its result in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), which held that a prison policy impinging on an inmate's First Amendment rights (relating to inmate marriages and inmate-to-inmate correspondences) was valid if it was reasonably related to legitimate penological interests. Finally, it rejected the argument that the NA program impermissibly burdened Kerr's rights under the Free Exercise Clause of the First Amendment or the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. In light of its rejection of Kerr's claims on the merits, the district court did not reach the defendants' claim of qualified immunity.

## III

### A. *Effect of Kerr's Parole*

■ Before turning to the merits of the claims Kerr raises, we must consider one preliminary question: which, if any, of them are still properly before us? On August 14, 1995, after the district court granted summary judgment and this appeal was docketed, Kerr was paroled from Oakhill. This action renders his claim for injunctive relief from the mandatory attendance requirement moot. *City of Los Angeles v. Lyons,* 461

U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Knox v. McGinnis,* 998 F.2d 1405, 1413–14 (7th Cir.1993). Counsel for the State asserted at oral argument that August 14th was the earliest date at which he could have been paroled, but Kerr claimed that this was not true. Unfortunately, the record before us is inadequate to resolve this matter, which means on summary judgment review that we must accept Kerr's account for present purposes. Thus, it is at least possible that Kerr's objections to the NA program may have had an adverse effect on his parole consideration.

■ At oral argument, we inquired whether he had any other claims for injunctive relief, and Kerr's lawyer noted that Kerr had also requested the expungement from his prison records of any adverse references related to his unwillingness to attend the NA program. Counsel for the State conceded that Kerr had made such allegations and that the State had offered nothing in response to them in the record below. Therefore, on the record properly before us, Kerr continues to have standing with respect to his claim to have the alleged negative references about his attendance at the NA meetings expunged from his prison records, because any such references may have a continuing adverse impact on him. *Del Raine v. Carlson,* 826 F.2d 698 (7th Cir.1987); *Chapman v. Pickett,* 586 F.2d 22, 26 (7th Cir.1978). *Cf., Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 2675–76, 96 L.Ed.2d 654 (1987) (release from prison did not moot plaintiff's claims involving expungement of misconduct from prison records and prisoner could have qualified as prevailing party if he had sought a declaratory judgment or expungement order). The parties on remand, of course, will be able to explore this question further, and we recognize that once the district court has an opportunity to examine Kerr's prison records, the facts may show either that certain material should be expunged, or that there is nothing to expunge.

Finally, for purposes of the present appeal, Kerr's parole does not moot his claims for damages against the officials in their individual capacity—a claim Kerr's lawyer stressed he was still trying to present. These claims, however, are the ones affected by the qualified immunity defense, which we consider below.

### B. Oakhill's NA Program and the Establishment Clause

■ The Establishment Clause guarantees that the "government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 678, 104 S.Ct. 1355, 1361–62, 79 L.Ed.2d 604 (1984)). The Supreme Court put it this way in the leading case of *Everson v. Board of Education,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947):

[t]he "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.*

This means, the Court later held in *County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 590–91 [109 S.Ct. 3086, 3099, 106 L.Ed.2d 472] (1989), that the "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate against persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not

involve itself too deeply in such an institution's affairs." (Footnotes omitted.)

It would be an understatement to say that the Supreme Court has wrestled with the precise content of these principles over the years, as it has confronted a wide variety of challenges to federal and state actions that allegedly violate the Establishment Clause. Justice Blackmun's concurring opinion in *Lee* noted that since 1971 alone, the Court had decided 31 Establishment Clause cases, see 505 U.S. at 601–03 n. 4, 112 S.Ct. at 2663 n. 4, and the numbers keep growing. As the Court's language from *Lee* quoted above suggests, however, these cases can be divided for convenience of analysis into two broad categories.

In the first group of cases, those dealing with government efforts to "coerce anyone to support or participate in religion or its exercise," the essence of the complaint is that the state is somehow forcing a person who does not subscribe to the religious tenets at issue to support them or to participate in observing them. These cases can be thought of generally as the "outsider" cases, where the state is imposing religion on an unwilling subject. Thus, for example, in *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), the Court struck down a Maryland law that required individuals appointed to public office in that state to declare their belief in the existence of God. In the school prayer cases, the Court struck down the practice of beginning the school day with a prayer, scripture readings, or the Lord's Prayer, where some students (or their families) did not subscribe to the religious beliefs expressed therein. See *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (official prayer); *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Bible reading and Lord's Prayer). Justice Brennan's concurring opinion in *Schempp* underscored the risk to outsiders when it pointed out the religious diversity that exists in the United States today. 374 U.S. at 240, 83 S.Ct. at 1581. The fact that the prayers and morning exercise sessions were technically voluntary did not dispel the inherently coercive nature of the setting for impressionable children, compelled by law to attend the school. The concerns expressed by the Court in *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), which struck down Alabama statutes that prescribed a moment of silence for voluntary prayer and that permitted teachers to lead willing students in prayer, were similar. Quoting from the earlier decision in *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943), the Court held that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." 472 U.S. at 55, 105 S.Ct. at 2488–89. Finally, *Lee* itself struck down the practice of including a nondenominational religious invocation and benediction as part of a public school graduation ceremony, where "young graduates who object are induced to conform." 505 U.S. at 599, 112 S.Ct. at 2661.

The second group of cases has inspired more controversy within the Supreme Court itself. These are the cases in which existing religious groups seek some benefit from the state, or in which the state wishes to confer a benefit on such a group (or groups). *Everson,* where the Court upheld a state statute that provided publicly funded transportation services for parochial school students, belongs in this category. 330 U.S. at 17–18, 67 S.Ct. at 512–13. No one was forcing families to send their children to parochial schools; the "establishment effect" came from the use of the protesting taxpayers' dollars to help those students or their families. *Lemon ·v. Kurtzman,* often considered the case providing the definitive test for Establishment Clause claims, is another example of a case concerned with how far the state may help religious "insiders." In *Lemon,* the question concerned the constitutionality of Pennsylvania and Rhode Island programs designed to provide financial support to nonpublic elementary and secondary schools, including parochial schools. Both involved challenges to statutes that provided assistance with teacher salaries, and in the Pennsylvania case, also a statute providing for assistance with textbooks and instructional materials. Applying its now famed three-part test, the Court in

*Lemon* concluded that the programs were unconstitutional. See also *Wolman v. Walter*, ·433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (assessing constitutionality of various forms of assistance to parochial schools). Compare *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (finding program that released religious students from class during a specified time each day for off-campus religious instruction constitutional) with *Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (finding program that released religious students from class during a specified time each week for on-campus religious instruction unconstitutional, with some members of the Court noting their concern about coercion).

The cases dealing with the availability of various kinds of public fora for religious groups or religious displays are principally concerned with how far the state may assist pre-existing religious groups. A number of cases have explored the right of student groups with a religious orientation to be treated in the same manner as other, nonreligious, student groups. See *Rosenberger v. Rector & Visitors of Univ. of Va.*, — U.S. —, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (the University denied a religious group its free speech rights when it refused on viewpoint grounds to provide the group funding for its newspaper; Establishment Clause did not require or excuse the University's action); *Westside Community Board of Ed. v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (Equal Access Act, 20 U.S.C. §§ 4071–74, forbids school from denying permission to a student religious group to meet on school premises during noninstructional time; Act so construed is consistent with the Establishment Clause); *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (a state university, which makes its facilities generally available for student groups, may not exclude a student group wishing to use those facilities for worship and religious discussion). Other cases, both at the Supreme Court and in this Circuit, have considered the extent to which a state or city may include particular religious symbols in public displays. See, *e.g.*, *Capitol Square Review and Advisory Bd. v. Pinette*, — U.S. —, — – —, 115 S.Ct. 2440, 2446–50, 132 L.Ed.2d 650 (1995) (state did not violate Establishment Clause by permitting Ku Klux Klan to display a Latin cross on the grounds of the state capitol); *Allegheny County*, 492 U.S. at 592–602, 109 S.Ct. at 3100–06 (crèche in county courthouse violates the Establishment Clause, but menorah outside the city-county building does not); *Lynch*, 465 U.S. at 680–85, 104 S.Ct. at 1362–66 (crèche included in Christmas display with Santa Claus house, Christmas tree, and "Season's Greetings" banner does not violate the Establishment Clause); *Grossbaum v. Indianapolis–Marion Bldg. Authority*, 63 F.3d 581, 595 (7th Cir.1995) (placement of menorah in lobby of a municipal building under an evenhanded policy of allowing expression on the holiday season does not violate the Establishment Clause); *Gonzales v. North Township of Lake County, Ind.*, 4 F.3d 1412, 1422–23 (7th Cir.1993) (memorial crucifix honoring members of the armed services in a public park violates the Establishment Clause); *Harris v. City of Zion, Lake County, Ill.*, 927 F.2d 1401, 1414–15 (7th Cir.1991) (presence of Latin cross, dove, and crown along with the words "God Reigns" on city's seal violates the Establishment Clause), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 897 (1992). While some of these cases, such as Harris, have significant elements of forcing religion on outsiders, in the main they illustrate the ways in which the state may make public facilities available for existing religious groups.

There is virtually no dispute in the Supreme Court that, in principle, the first kind of case identified here, the "outsider" case, falls within the scope of the Establishment Clause. As Justice Blackmun (writing for himself, Justice Stevens, and Justice O'Connor) put it in his concurring opinion in *Lee*, "[a]lthough our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient. Government pressure to participate in a religious activity is an obvious indication that the government is endorsing or promoting religion." 505 U.S. at 604, 112 S.Ct. at 2664. Justice Scalia (writing for himself, the Chief Justice, and Justices White

and Thomas) agreed that "[t]he government can, of course, no more coerce political orthodoxy than religious orthodoxy." *Id.* at 638, 112 S.Ct. at 2682. Justice Kennedy's opinion for the majority, as already noted, called it "beyond dispute" that the Constitution guarantees that the government may not coerce anyone to support or participate in religion or its exercise. Individuals may disagree in a particular case over other issues, such as whether it is the state who has acted, or whether coercion is present, or whether religion or something else is the aim of the coercion. But in general, a coercion-based claim indisputably raises an Establishment Clause question.

The debate that has raged among scholars and among members of the Supreme Court has centered on the second type of case: those elusive "insider" cases in which the state has taken some action that helps existing religions-action, in doctrinal terms, that establishes a religion or tends to do so. See, *e.g.,* Kent Greenawalt, *Quo Vadis: The Status and Prospects of "Tests" under the Religion Clauses,* 1995 Sup.Ct. Rev. 323 (1995); Carl H. Esbeck, *A Restatement of the Supreme Court's Law of Religious Freedom: Coherence, Conflict, or Chaos,* 70 Notre Dame L.Rev. 581 (1995); Michael McConnell, *Accommodation of Religion: An Update and a Response to the Critics,* 60 Geo. Wash. L.Rev. 685 (1992). These are the cases for which the *Lemon* test was designed, which asks (1) whether the statute has a secular legislative purpose, (2) whether its principal or primary effect is one that neither advances nor inhibits religion, and (3) whether it avoids excessive entanglement with religion. 403 U.S. at 612–13, 91 S.Ct. at 2111–12. Some Justices have distilled from this a more general inquiry into whether the state is endorsing religion. See *Allegheny County,* 492 U.S. at 628, 109 S.Ct. at 3119–20 (O'Connor, J.); *Lee,* 505 U.S. at 626–28, 112 S.Ct. at 2676 (Souter, J., stating that the state may not favor or endorse either religion generally over nonreligion or one religion over others). Important though the question is, we need not decide here what the controlling test from the Supreme Court is for cases raising questions about the way in which the state treats existing religious groups. Kerr's

case is more simple. As noted above, he has alleged that the prison authorities of the State of Wisconsin are coercing him, under threat of meaningful penalties, to attend religious meetings. As he put it in his affidavit to the district court, "to force me to attend [NA] is at least as offensive as many people would find forced attendance of services at a Mosque, a Jewish Temple, or a meeting of Penticostals [sic], to be."

■ In applying the *Lemon* test to Kerr's claim, the district court did not take into account the substantial Establishment Clause jurisprudence that the Supreme Court has developed since *Lemon,* which we have tried to summarize here. In our view, when a plaintiff claims that the state is coercing him or her to subscribe to religion generally, or to a particular religion, only three points are crucial: first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular? In Kerr's case, the first two criteria are satisfied easily. There is no question that the prison authorities act for the State of Wisconsin in these circumstances. The fact that NA ran the treatment program is of no moment, since it is clear that the prison officials required inmates to attend NA meetings (at the very least, to observe). On the record as it comes to us, it is also undisputed that Kerr was subject to significant penalties if he refused to attend the NA meetings: classification to a higher security risk category and adverse notations in his prison record that could affect his chances for parole. (Although Kerr himself was never reclassified, we noted above that he alleged that his parole consideration was affected, and he also alleged that the adverse notations could still harm him in the future.) Looking at the program in general, this is not a case where the plaintiff argues that coercion occurred through the denial of benefits, or other more complex variations on that theme.

■ The final element requires somewhat more discussion. The district court thought that the NA program escaped the "religious" label because the twelve steps used phrases like "God, as we understood Him," and be-

cause the warden indicated that the concept of God could include the non-religious idea of willpower within the individual. We are unable to agree with this interpretation. A straightforward reading of the twelve steps shows clearly that the steps are based on the monotheistic idea of a single God or Supreme Being. True, that God might be known as Allah to some, or YHWH to others, or the Holy Trinity to still others, but the twelve steps consistently refer to "God, as we understood *Him*." Even if we expanded the steps to include polytheistic ideals, or animistic philosophies, they are still fundamentally based on a religious concept of a Higher Power. Kerr alleged, furthermore, that the meetings were permeated with explicit religious content. This was therefore not a case (again, on the present record) where the only religious note was struck by the insertion of the words "under God" in the Pledge of Allegiance, or other incidental references that the courts have upheld. See, *e.g.*, *Sherman v. Wheeling School District*, 980 F.2d 437 (7th Cir.1992). Because that is true, the program runs afoul of the prohibition against the state's favoring religion in general over non-religion.

The Court of Appeals of New York has recently come to the same conclusion we reach today in *Matter of David Griffin v. Coughlin*, No. 73, 1996 WL 317180, 63 USLW 2003, — N.Y.2d ——, — N.Y.S.2d ——, — N.E.2d —— (N.Y.App.Ct. June 11, 1996). In that case, the Court of Appeals held that the Establishment Clause does not permit the state to deprive an atheist or agnostic inmate of eligibility for an expanded family visitation program because of his refusal to participate in the sole alcohol and drug rehabilitation program at his state correctional facility—the same AA and NA programs at issue here. Two federal district courts have also decided similar cases. In *Warner v. Orange County Dept. of Probation*, 870 F.Supp. 69 (S.D.N.Y.1994), the court decided that the Establishment Clause was violated when the only option available to a convicted motorist for required rehabilitation was the program run by AA. In the other case, *O'Connor v. California*, 855 F.Supp. 303 (C.D.Cal.1994), the court found no violation because the AA program was one of a variety of options available to the convicted driver, any of which would satisfy the condition of his probation. In our case, as we have noted, the only choice available to Kerr was the NA program. Our conclusion is thus in harmony with that of other courts that have considered similar questions.

## C. Qualified Immunity

■ Kerr's claim for damages against the prison officials leads us directly to the question of qualified immunity, which the prison officials have urged as an alternate ground for affirmance on appeal. Qualified immunity is available to shield government officials who are performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Recognizing that the question of the level of generality at which the relevant "legal right" is to be identified is often dispositive, the Supreme Court cautioned against imposing an unrealistic burden on public officials in *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). The appropriate question is whether reasonable public officials in their position would have understood that what they were doing was unlawful. *Id.* at 640, 107 S.Ct. at 3039. Concretely, we must decide whether a reasonable prison official would have known, at the time Kerr was forced to "observe" the NA program, that this requirement violated the Establishment Clause.

■ Although it has been clear for many years that the state may not coerce people to participate in religious programs, see *Barnette* (1943), *Torcaso* (1961), and *Engel* (1962), the particular application of this principle to prisons has arisen only recently in the courts. See *Matter of David Griffin, Warner*, and *O'Connor, supra*. One district court, considering a similar case against officials regarding the operation of an alcohol rehabilitation program at a correctional facility, found that a reasonable official might have concluded that the program satisfied the *Lemon* test, and thus concluded that

qualified immunity was appropriate. *Scarpino v. Grosshiem,* 852 F.Supp. 798 (S.D.Iowa 1994). The district judge here as well concluded that the program survived scrutiny under *Lemon.* While we conclude that the facts on the summary judgment record do not support that conclusion, under *Anderson* we cannot say that a reasonable prison official should have known that her actions were unlawful. We conclude that Farrey and Lind were entitled to qualified immunity on Kerr's damages claims against them and that those claims should be dismissed on remand.

### D. Kerr's Free Exercise Claim

■ Before the district court, Kerr also complained that requiring his attendance at NA meetings impeded his ability to practice his own personal religion in violation of the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* This court has recently considered Free Exercise claims in the prison context in two cases, *Sasnett v. Sullivan,* 91 F.3d 1018 (7th Cir.1996), and *Mack v. O'Leary,* 80 F.3d 1175 (7th Cir. 1996). Although these cases illustrate that prison inmates may, on occasion, state valid claims under these theories, they are of no help to Kerr. On appeal, he has failed to develop this line of argument, aside from noting the tension between the principles of NA and his belief in free will. He is therefore deemed to have waived these claims. Federal Rule of Appellate Procedure 28(a)(5); *Doherty v. City of Chicago,* 75 F.3d 318, 323–24 (7th Cir.1996).

The judgment of the district court is RE-VERSED and REMANDED for further proceedings consistent with this opinion.