**FREEDOM FROM RELIGION FOUNDATION, INC., Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker, Plaintiffs,**

v.

**Scott McCALLUM, Jennifer Reinert, Richard Gartner, George Lightbourn and Jon E. Litscher, Defendants,**

and

**Faith Works, Milwaukee, Inc., Defendant–Intervenor.**

No. 00–C–617–C.

United States District Court, W.D. Wisconsin.

July 26, 2002.

Richard L. Bolton, Boardman, Suhr, Curry & Field, Madison, WI, for plaintiffs.

Bruce A. Olsen, Assistant Attorney General, Madison, WI, for defendants.

Daniel Kelly, Reinhart, Boerner, Van Deuren, Milwaukee, WI, for defendant-intervenor.

Theodore C. Hirt, U.S. Department of Justice, Federal Programs Branch, Washington, DC, for amicus.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for declaratory and injunctive relief brought pursuant to 42 U.S.C. § 1983. Plaintiffs Freedom From Religion Foundation, Inc., Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker contend that defendants violated the establishment clause of the First Amendment to the Constitution by funding defendant-intervenor Faith Works, Milwaukee, Inc., a faith-based, long-term alcohol and other drug addiction treatment program. Specifically, plaintiffs contend that two of Faith Works' funding streams violate the establishment clause: a grant from the Department of Workforce Development and a contract with the Department of Corrections. In an order entered January 8, 2002, I determined that the Department of Workforce Development's funding of Faith Works violated the establishment clause of the First Amendment to the Constitution, granted plaintiffs' motion for summary judgment as to this funding and denied defendant-intervenor Faith Works's motion for summary judgment as to this funding. In the same order, I denied both plaintiffs' and defendant-intervenor Faith Works' motions for summary judgment as to the Department of Corrections' funding of Faith Works, finding that the undisputed facts did not establish whether offenders under the supervision of the department who participate in the Faith Works program do so of their own independent, private choice.

On May 28, 2002, a trial was held on this narrow issue. Before trial, the parties agreed to the facts surrounding the Department of Corrections funding of Faith Works. Although it is a close question, I find from the stipulated facts that offenders participate in Faith Works as a result of genuinely independent, private choice and that this choice makes the Department of Corrections contract with Faith Works an indirect program that does not convey a message of endorsement. Accordingly, I conclude that the Department of Corrections funding of Faith Works does not

violate the establishment clause of the First Amendment to the Constitution.

In this opinion, I will set out only the facts to which the parties stipulated before trial. Additional undisputed facts can be found in the January 8, 2002 order.

## STIPULATED FACTS

### A. *Department of Corrections Contract with Faith Works*

The Department of Corrections entered into a contract with Faith Works to provide services as part of a contract between the department and the Department of Workforce Development. Under this contract, a federal grant made funds available to the Department of Workforce Development for programs designed to eliminate barriers to employment and to promote the support of dependent children by their fathers. Under the contract, the Department of Workforce Development provides partial funding for eligible offenders and the Department of Corrections provides a matching component of money or in-kind services. The program funded under the contract with the Department of Workforce Development was known as the Non-traditional Opportunities for Work program. In the Milwaukee area, the Department of Corrections entered into contracts for Non-traditional Opportunities for Work program services with five Welfare–to–Work agencies and, later, with Faith Works.

In November 1999, after former Governor Thompson signed a bid waiver and other necessary documents, the Department of Corrections entered into a contract with Faith Works in an amount not to exceed $49,961 for five beds over a period of nine months. The contract provided that Faith Works would deliver the following services: twenty-four hour residential care, services and supervision; individual and group counseling; sufficient qualified staff; intake assessments; individual treatment and supervision plans for each resident; programming; monitoring; transportation; drug screening; entrance physical examinations; medical services; and aftercare plans; that the provider "agrees to comply with State and Federal constitutions, laws or rules and regulations . . . .;" and that the Department of Corrections would reimburse Faith Works for services provided to department offenders, up to a total of $50,000.

In the summer of 2000, the Department of Corrections contract with Faith Works was approved for extension. The extended contract had a cap of $85,000 for services billed by Faith Works. In the fall of 2001, the Department of Corrections contracted for up to an additional $25,000 of services from Faith Works to pay for services provided to two offenders still enrolled at Faith Works.

When the contract was extended, Faith Works was the only nine to twelve-month residential treatment facility available under the Non-traditional Opportunities for Work program. The Department of Corrections had a Non-traditional Opportunities for Work program director in the Milwaukee area, Margaret Browder, as well as specific agents. These agents supervised the offenders who were receiving services provided through the Non-traditional Opportunities for Work-funded programs, including Faith Works.

The money allocated to the Department of Corrections was not an unconditional grant; it could be used only for the specific services provided through the Non-traditional Opportunities for Work program. The Department of Corrections provided information about the Non-traditional Opportunities for Work program and the resources available through the program to supervisors and agents in the Milwaukee

area. Agents were encouraged to refer clients to the program when specific services were appropriate for an offender's specific needs. In order to encourage utilization of Non-traditional Opportunities for Work resources, including Faith Works, the Department of Corrections kept agents and supervisors advised of the availability of services, including the availability of space at Faith Works for referral of eligible offenders. Not all eligible offenders were appropriate candidates for referral to Non-traditional Opportunities for Work programs, including Faith Works, because the offender's particular needs did not match program availability best. For those offenders who did participate in the Faith Works program, the cost to the Department of Corrections was $47 a day for each participant over a period of nine to twelve months.

### B. *Contract Bid Waiver*

The Department of Corrections sought a waiver of the requirements of competitive bidding each time it contracted with Faith Works. The department justified bid waivers for Faith Works because of the uniqueness of the program, including its length, its residential feature and its faith component. In a bid waiver request dated August 23, 1999, the Faith Works program was described as a

> long term (9 month) residential treatment program for males that is faith based ... The program is based on Christian principles; however, will accept any male of any faith who wants to strengthen their faith. The program is 9 months in length with an emphasis on employment, responsible parenting and overcoming addiction problems. The program is based on a phase system wherein residents first address their addiction problems and then must find employment and begin paying child support. Offender admitted would have to

voluntarily agree to participation and to working on their faith. Faithworks is a well known program in New York City that is praised for their success in working with homeless, drug or alcohol addicted men.

At least since 1991, the Department of Corrections has not sought bid waivers for residential treatment providers in the Milwaukee area other than for Faith Works.

### C. *Faith Works Services*

In addition to Faith Works, the Division of Community Corrections also contracts with the following non-faith based halfway houses in the Milwaukee area: Horizon House, Independent Living Center, Interventions, Joshua Glover Halfway House, Thurgood Marshall House and The Bridge Halfway House. The programs these facilities offer are generally 30–90 days in length, whereas the Faith Works program provides nine to twelve months of residential treatment.

The Department of Corrections considers that the length of the Faith Works program and its residential component contribute to the success of some offenders in dealing with drug and alcohol problems. The department's experience indicates that longer treatment in a supervised setting offers the greatest chance for successful treatment of some offenders' drug and alcohol problems.

Department of Corrections staff knew that Faith Works included a religious component in its treatment program when it contracted with Faith Works. The offenders who participate in the Faith Works program receive a variety of services, as well as room and board, that are paid for by the Department of Corrections pursuant to its contract with Faith Works. Other than the faith component, all of the services provided by Faith Works are also provided by non-faith-based service pro-

viders, although all of the services may not be available at a single service provider.

### D. *Offender Eligibility and Referral*

Not all offenders were eligible to enroll in Faith Works under the Non-traditional Opportunities for Work program, which requires that the individual have dependent children. Eligible Department of Corrections offenders who participated in Faith Works were referred to the program by probation and parole agents. Offenders are not given carte blanche to choose whatever program they desire or a sum certain that they can use for whatever treatment services they select.

At the time the Division of Community Corrections began referring probationers and parolees under its control to Faith Works, the department had in place the following policy directive, contained in Administrative Directive 99–15, effective October 19, 1999:

> Agents can order offenders to attend specific treatment or support programs as long as they are secular in nature. An offender may choose to attend a treatment program with religious components, but a non-religious alternative must be offered and agents must document this. For example: An offender is required to attend a support program. The agent directs the offender to attend a non-religious program but the offender requests to attend AA and the agent agrees. The agent must document that it was the offender's choice to attend AA in order to consider the offender in violation of supervision should the offender fail to attend AA meetings.

Administrative Directive 99–15 was disseminated to all staff in the Division of Community Corrections, with instructions that the policy should be discussed at staff meetings. AD 99–15 required probation and parole agents to inform offenders of the religious content of the treatment program, to obtain the offender's consent to participate in the program and to document the offender's choice to participate. AD 99–15 did not require agents to offer offenders specific, alternative secular treatment programs at the time they offered treatment or programs with religious content.

Between 1999 and the present, Department of Corrections agents have been instructed repeatedly to tell offenders that Faith Works is a religious treatment program and that offenders do not have to participate in the program. Probation and parole agents who referred offenders to Faith Works between December 1999 and May 2001, informed offenders that the program had religious content and asked the offenders whether they had any objection to the religious content of the Faith Works program.

All the offenders who were referred to Faith Works stated that they had no objection to the religious component of the program. Susan Wundrow, a parole and probation agent in the Milwaukee area, testified that, during the period December 1999 to May 2001, if an offender had objected to participating in the Faith Works program, she would have talked to her supervisor about placing the offender in a non-faith-based halfway house. Under the policy embodied in AD 99–15, offenders would not necessarily be offered a secular alternative to Faith Works, although the offender would be asked whether he objected to the referral.

Agents could refer eligible offenders to Faith Works if they thought that the offender's needs matched the Faith Works program and that the offender would benefit from the program. For example, one agent stated that she wanted desperately to enroll an offender in Faith Works if a bed was available. Although her supervi-

sor cautioned her that Faith Works did not have alcohol and other drug addiction-certified counselors on staff, the agent responded that she was most interested in the long-term, supervised residential aspect of the program for the particular offender and contacted the offender to see whether he objected to a religious program.

Under AD 99–15, agents could make participation in Faith Works part of the "Probation/Parole Rules" implemented for a particular offender, but only after informing the offender of the faith-based component and confirming that he had no objection to that component. In making referrals for services, including residential alcohol and other drug addiction treatment, Department of Corrections agents would exercise their best judgment in trying to match offenders to programs that best met the offender's needs.

Faith Works is described to offenders as being nondenominational and willing to work with persons of any faith. Offenders referred to Faith Works must acknowledge a willingness to work on their problems in a faith-based program. Offenders who agree to participate in the Faith Works program are then interviewed by staff at Faith Works, where they are also told about the religious component of the program and the expectations for participants.

Offenders who fail to complete the Faith Works program receive the same treatment from the Division of Community Corrections as offenders who fail to complete non-faith-based halfway house programs.

The Department of Corrections has discontinued making new referrals to Faith Works pending the outcome of this litigation and program review.

### E. *Alternative to Revocation*

When appropriate, probation or parole agents may refer offenders to Faith Works as an alternative to revocation. An alternative to revocation may be used by agents when an offender is in revocation status for committing a new criminal offense or for violating rules of probation or parole. An offender in revocation status may be held in jail while the Department of Corrections decides whether to revoke probation or parole formally or to impose other less restrictive conditions that would allow for continued probation or parole status. If probation or parole is revoked, then the offender is returned to a correctional institution. If an offender does not comply with the alternative to revocation agreement, he will be considered for revocation and return to a correctional facility or a less restrictive condition, as warranted. In general, Department of Corrections offenders want to avoid formal revocation. However, agents making referrals to Faith Works believe that the offenders they have referred to Faith Works would not have hesitated to object to a religious treatment program if they were opposed.

Before making referrals to Faith Works as an alternative to revocation, an offender's agent usually has a case staffing meeting with a supervisor. During that meeting, the offender's situation is reviewed fully, with consideration given to such factors as the seriousness of the offense that led to revocation status, the offender's need for treatment and alternatives to revocation. At the meeting, staff decide whether to seek formal revocation or to pursue an alternative to revocation. The agent and, in some cases, the supervisor, may decide that the offender would benefit from treatment at Faith Works.

In the case of an offender facing an alternative to revocation, the agent contacts the offender. Under the prior policy

embodied in AD 99–15, the agent would then tell the offender that referral to Faith Works was being recommended as an alternative to revocation, but the agent would tell the offender also that the program is religious and that the offender cannot be ordered to participate. The agent would tell the offender that he or she believed that the offender would benefit from the Faith Works program, but that the decision to participate in the Faith Works program was voluntary.

If the offender agreed to the Faith Works referral, he would sign an alternative to revocation agreement. If an offender objected to Faith Works before signing such an agreement, then the agent would have discussed other options with the agent's supervisor in order to resolve the offender's revocation status.

Department of Corrections referrals to Faith Works have involved offenders who were facing the alternative of formal revocation and offenders who were just beginning their terms of probation or parole. Although Department of Corrections agents understood that participation in Faith Works could not be mandated as a formal alternative to revocation or as a condition of probation or parole, the agents would identify Faith Works specifically as a recommended option to the offender, subject to the offender's agreement. In the case of Faith Works, at least some Department of Corrections agents referred offenders there who they knew had a religious orientation.

### F. *Referral Alternative*

Effective July 1, 2001, the Division of Community Corrections issued Administrative Directive 01–10 to replace AD 99–15. The directive provided, in part:

> An agent may order an offender to attend a specific secular (non-religious) treatment or support program. An agent may not order an offender to attend a specific program with a religious component. An offender may voluntarily participate in a treatment or support program with a religious component as long as a non-religious program is offered.
>
> An agent may write a rule requiring an offender to attend and complete AODA treatment without naming a specific program. An agent may also provide an offender with a list of acceptable programs, as long as both secular and nonsecular options are clearly identified. If an offender chooses to participate in a program having a religious component, the agent should document in the Chronological Log that a secular program was offered.

Administrative Directive 01–10 was distributed to all staff in the Division of Community Corrections, with instructions to discuss the policy at staff meetings. The principal difference between AD 99–15 and AD 01–10 is that the latter requires probation and parole agents to offer an offender a specific secular alternative to any treatment program with religious content. The Division of Community Corrections has never issued a policy directive or any other policy statement instructing or allowing parole and probation agents to require offenders to attend Faith Works on anything other than a voluntary basis. Pursuant to AD 01–10, agents making referrals to Faith Works still advise the offender that the agent considers Faith Works to be a beneficial option for him but they also advise the offender that participation in the program is voluntary and identify a specific secular alternative to Faith Works. The current policy of the Department of Corrections Division of Community Corrections is to require that referrals to Faith Works comply with AD 01–10.

Other Department of Corrections treatment programs available in the Milwaukee area are typically filled to capacity at any given time and have waiting lists. In general, offenders cannot extend their stay at these facilities because of the waiting lists.

The two most recent referrals of offenders to Faith Works were · on March 23, 2001 and May 1, 2001. No offenders have been referred to Faith Works since the promulgation of AD 01–10 in July 2001.

In September 2001, Corrections Services Supervisor William Rankin learned that two offenders were still enrolled in the Faith Works program and that there was no current contract with Faith Works. Rankin could not determine whether the offenders had been offered secular alternatives to Faith Works at the time they were referred to the program and decided that the offenders had to be removed from the program. The agent who supervised the two offenders, Barbara Boettger, objected to their removal because both men wanted to stay at Faith Works and were doing extremely well in the program. Rankin sent an electronic message to Boettger that stated:

> Please review the attached document with your clients presently in Faithworks. If they FREELY CHOOSE to stay in Faithworks, have them sign the document. Make sure to emphasize that a non-religious program will be provided if they prefer. If they CHOOSE to remain in Faithworks we will continue our commitment to fund their participation. This agreement must be completed ASAP. (Not later than tomorrow. Today if possible.) Document the agreements in your chrono notes and keep the signed agreement in your file.

The agreement provides:

> My Probation/Parole Agent has recommended that I participate in a program for treatment of alcohol and/or other drug abuse. I understand that the Department of Corrections may not compel me to participate in any treatment program having a religious component, unless I have also been offered a non-religious program alternative, and I have freely chosen the program with a religious content.
>
> I am choosing to participate in the treatment program at: _____ and I understand that it has a religious component. I understand that a non-religious treatment program will be provided for me.if I choose not to participate in this program on grounds of my religious freedom.

On September 10, 2001, Boettger sent an electronic mail message to Rankin, indicating that· both offenders had signed the forms and that they were happy to do so. Boettger's message states that both offenders were offered treatment at Interventions, a secular residential treatment facility with a 90 day program, in the event they decided to leave Faith Works, and that both forms were placed in·the offenders' case files. Currently, no offenders under the supervision of the Department of Corrections are participating in the Faith Works program.

## OPINION

*First Amendment: Establishment Clause*

■ The establishment clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." It prevents the government from promoting any religious doctrine or organization or affiliating itself with one. *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 589, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). It "is a specific prohibition on forms of state intervention in religious af-

fairs," *Lee v. Weisman,* 505 U.S. 577, 591, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and its proscription applies equally to state legislatures under the due process clause of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

■ To identify improper sponsorship, financial support or active involvement of the government in religious activity, courts ask "whether the government acted with the 'purpose' or 'effect' of advancing or inhibiting religion." *Agostini v. Felton,* 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). At the summary judgment stage, I noted that the Faith Works program advances the valid secular purposes of providing drug and alcohol treatment and employment training and reviewed the state's funding of the program according to the three primary criteria enumerated by the Supreme Court in *Agostini* for evaluating whether government aid has the primary effect of advancing religion: whether the statute or program in question "result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement." *Id.* at 234, 117 S.Ct. 1997. After determining that the Faith Works program does not define its recipients by reference to religion or create excessive entanglement, I found that the undisputed facts did not establish whether the Department of Corrections funding of Faith Works results in governmental indoctrination, that is, indoctrination that could be attributed to the state.

The Supreme Court has drawn a distinction between government programs that provide aid directly to religious schools and those involving true private choice, in which the government aid reaches the religious program "only as a result of the genuine and independent choices of private individuals." *Zelman v. Simmons–Harris,*

—— U.S. ——, ——, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002) (citations omitted). At the summary judgment stage, I determined that the Department of Corrections funding of Faith Works represented indirect aid to a religious program because the program does not receive payments of a set amount from the department but instead receives funding based on the number of offenders enrolled in the program. Thus, the narrow issue at the May 28, 2002 oral argument was whether the Department of Corrections funding reaches Faith Works "only as a result of the genuinely independent, private choice" of the offenders, *Mitchell v. Helms,* 530 U.S. 793, 841, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (O'Connor, J., concurring), which would allow a determination whether the religious indoctrination could be attributed to the state.

### 1. *Governmental indoctrination*

■ To show that the Department of Corrections funding of Faith Works "result[s] in governmental indoctrination," *Agostini,* 521 U.S. at 223, 117 S.Ct. 1997, plaintiffs must establish that such funding constitutes indoctrination or results in it and that such indoctrination is attributable to the government. *Id.* at 226, 117 S.Ct. 1997 (question of governmental indoctrination hinges on whether funding is result of private decision of individuals or could be attributed to state decision making) (citing *Zobrest v. Catalina Foothills School District,* 509 U.S. 1, 10, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993)). In the January 8, 2002 order, I considered Faith Works' daily activities as well as its faith-based approach to drug treatment and determined that the Faith Works program indoctrinates its participants in religion, primarily through its counselors. I now turn to the unresolved question whether that indoctrina-

tion can be attributed to the state because of the Department of Corrections funding.

■■■ "[S]tates may not make unrestricted cash payments directly to religious institutions." *Freedom from Religion Foundation, Inc. v. Bugher*, 249 F.3d 606, 612 (7th Cir.2001) (citing *Tilton v. Richardson*, 403 U.S. 672, 680–83, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971)). Direct subsidies are viewed as governmental advancement or indoctrination of religion. *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 842, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("special Establishment Clause dangers [exist] where the government makes direct money payments to sectarian institutions"). In contrast, when public funding flows to faith-based organizations solely as a result of the "genuinely independent and private choices of individuals," the funding is considered indirect. *Agostini*, 521 U.S. at 226, 117 S.Ct. 1997. When a program receives indirect funding, it is the individual participant, and not the state, who chooses to support the religious organization, reducing the likelihood that the public funding has the primary effect of advancing religion in violation of the establishment clause. Stated otherwise, when the individual chooses the religious program, the "circuit" between government and religion is broken and the establishment clause is not implicated. *Zobrest*, 509 U.S. at 13, 113 S.Ct. 2462. In addition, a plurality of the Supreme Court has held that as long as the individual selects the publicly funded program freely, thus making the funding truly indirect, it is irrelevant whether the funding passes through the hands of the individual first or goes directly to the selected program. *Mitchell*, 530 U.S. at 817, 120 S.Ct. 2530 (Thomas, J., plurality).

■■■ According to the stipulated facts, agents recommend a program, but inform offenders of the religious content of Faith Works (or any other program with religious content); they obtain the offender's consent to participate in the program; they document that consent; and they inform the offender that he cannot be ordered to participate in a religious treatment program. Under the current policy, agents must offer the offender a specific, secular alternative to the recommended program if it has religious content. None of the offenders referred to Faith Works objected to its religious component. These facts support a finding that offenders under the control of the Department of Corrections participate in the Faith Works program as the result of their own private, independent choice.

Plaintiffs argue, however, that the choice only appears to be independent and that in reality persons are not free to make their choice about participation. There is no evidence in the record supporting plaintiffs' argument. In particular, there is no evidence suggesting that offenders who reject a particular program are punished in any way. *Cf., Kerr v. Farrey*, 95 F.3d 472 (7th Cir.1996) (state may not compel offenders to participate in religious drug treatment program with negative consequences for not participating). Indeed, it is possible that some offenders may have an incentive to object to the Faith Works program to minimize the duration of their drug treatment requirement since Faith Works lasts between six and nine months compared to all other treatment programs' 30 to 90 days. Moreover, the offenders referred to the Faith Works program are adults, not school-age children that may be thought susceptible to indoctrination. *See, e.g., School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 307, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring) (Bible-reading program violated establishment clause in part because it

gave rise to inhibitions of freedom that come with government efforts to impose religious influence on "young impressionable [school] children"). In short, the fact that the offenders are under control of the department does not mean that they are incapable of making their own private, independent choice to participate in a particular program or not.

The Faith Works program is unique in terms of its length (nine to twelve months compared to 30 to 90 days), its holistic approach (incorporating employment readiness and family reintegration rather than only drug treatment) and its religious foundation. Although this uniqueness raises questions about the offenders' opportunity to choose, see *Zelman*, 122 S.Ct. at 2496–97 (Souter, J., dissenting) (arguing that in school voucher scheme, choice is Hobsonian because only alternative to public schools is religious), the Constitution does not require that the religious and non-religious options offered to an offender have identical features, but only that they be reasonable alternatives. For example, in *Kerr*, 95 F.3d at 480, in finding that the state could not compel an inmate to participate in a Narcotics Anonymous program to which he objected on religious grounds where the consequence of not participating was reclassification to a higher security status and negative effects on parole eligibility, the court of appeals made a point of distinguishing the facts of that case from those cases in which courts had not found a violation of the establishment clause "because the AA program was one of a variety available to the convicted driver, any of which would satisfy the condition of his probation." *Id.* (citing *O'Connor v. State of California*, 855 F.Supp. 303 (C.D.Cal.1994)). Unlike the inmates in *Kerr*, the offenders in this case are offered a secular alternative to Faith Works under the new policy. Although the options are not identical, any one of them would satis-

fy the condition of an offender's probation or parole or alternative to revocation. Despite plaintiffs' assertion that the lack of closely comparable secular alternatives makes the offender's choice empty, I am persuaded that the unique nature of the Faith Works program does not deprive offenders of a real choice.

It is true that because the state has pre-selected Faith Works as one of several treatment programs, the offender's choice is restricted. The offender is not free to receive treatment from any program he desires. He does not receive a brochure listing his options but instead receives a program recommendation from his agent, along with the information that he can refuse the recommended placement if he objects to its religious content and participate in a secular program instead. I do not consider these restrictions determinative. As defendants point out, it is typical for the government to pre-approve service providers. *See, e.g., Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (schools receiving public funding accredited by state); *Witters v. Washington Dept. of Services for Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (same); *Zobrest*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (same). The government's pre-selection of certain providers does not render the offender's choice something other than genuinely private and independent.

### 2. *Governmental endorsement*

Plaintiffs do not contend that Department of Corrections offenders do not participate in the Faith Works program as a result of their genuinely private, independent choice. Instead, they argue that because the department recommends Faith Works as a preferred treatment option, its funding of the program violates the establishment clause because such activity con-

veys a message of endorsement. Plaintiffs assert that as taxpayers, they have the right to object to the state's endorsement of religion with public money because the establishment clause guarantees that the government may not force anyone to support religion, even through the indirect use of tax money. *Kerr,* 95 F.3d at 476.

In the January 8, 2002 opinion, I stated that although endorsement remains applicable to a narrow window of cases involving matters such as prayer and the display of religious symbols and imagery on public property, *see, e.g., Books v. City of Elkhart,* 235 F.3d 292, 301–2 (7th Cir.2000), matters such as these are not present in this case. I concluded that an endorsement analysis was inapposite in this case but noted that if I were to consider such an argument, I would analyze it using the same factors used in analyzing the primary effect prong of the *Lemon* test, as prescribed by a majority of the Court in *Mitchell,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660. Upon reconsideration and because plaintiffs continue to base their challenge to the Department of Corrections funding of Faith Works on the message of endorsement it conveys, I believe the argument needs to be addressed in more depth.

■ Plaintiffs contend that the state's funding of Faith Works constitutes the governmental endorsement of religion. To arrive at this conclusion, plaintiffs argue that in an establishment clause challenge mounted by taxpayers, such as this, the fact that individuals may consent to the religious content of a particular program does not overcome the fact that the government is endorsing religion. In other words, it is irrelevant whether the recipients of the funding accept it voluntarily; Coerced participation is not a necessary element of an establishment clause violation. *ACLU Nebraska Foundation v. City*

*of Plattsmouth, Nebraska,* 186 F.Supp.2d 1024, 1031 n. 6 (D.Neb.2002) (citing *Tarsney v. O'Keefe,* 225 F.3d 929, 935 (8th Cir.2000)) ("The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonbelieving individuals or not."). According to plaintiffs, when the government puts its imprimatur on religion, as it does when recommending a religiously-based program like Faith Works, it conveys a message of endorsement that consent cannot overcome. *See, e.g., Mitchell,* 530 U.S. at 843, 120 S.Ct. 2530 (O'Connor, J., concurring).

■ The problem with plaintiffs' argument is that it overlooks recent establishment clause precedent. Although it is true that an over-arching goal of the establishment clause is to prevent the government from placing its imprimatur on religion, recent cases have held that private individuals can nullify any appearance of government endorsement through true private choice programs under which government aid reaches the religious program "only as a result of the genuine and independent choices of private individuals." *Zelman,* 122 S.Ct. at 2465. "[W]hen government aid supports a school's religious mission only because of independent decisions made by numerous individuals to guide their secular aid to that school, 'no reasonable observer is likely to draw from the facts ... an inference that the State itself is endorsing a religious practice or belief.'" *Mitchell,* 530 U.S. at 843, 120 S.Ct. 2530 (O'Connor, J., concurring) (citing *Witters,* 474 U.S. at 493, 106 S.Ct. 748). Such a program insures that " 'no imprimatur of state approval' can be deemed to have been conferred on any particular religion, or on religion generally." *Zelman,*

122 S.Ct. at 2466 (citing *Mueller*, 463 U.S. at 399, 103 S.Ct. 3062). Even though the Department of Corrections' payments to Faith Works do not pass through the hands of offenders literally, a plurality of the Court has held that this step is a mere formality. *Mitchell*, 530 U.S. at 816, 120 S.Ct. 2530. Instead, the crucial criteria are whether the aid is neutral and whether there is virtual private choice. *Id.* In essence, the Court has adopted a circuit breaker model, under which the incidental advancement of a religious message is attributable to the individual aid recipients, who make the independent, private choice where to direct the public funding, rather than the government, whose role ends with the disbursement of the benefits. *Zelman*, 122 S.Ct. at 2467.

Plaintiffs deny the aptness of the circuit breaker analogy when the state sponsors or endorses religious activity. According to plaintiffs, the Supreme Court rejected the circuit breaker theory in cases in which the state sponsors the religious activity. In support of this proposition, plaintiffs rely on *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), in which high school students challenged their school's policy of sanctioning a student-led invocation before varsity football games. The Court determined that the policy authorized private speech to the detriment of minority views, had the purpose of furthering religion and involved both perceived and actual endorsement of religion. *Id.* at 308, 120 S.Ct. 2266. The Court rejected the assertion that the policy does not coerce students to participate in religious services, determining instead that students should not be forced to choose between attending football games and avoiding personally offensive religious rituals.

Plaintiffs cannot rely on *Santa Fe* for the proposition that the Court has rejected the circuit breaker theory. In *Santa Fe*, the Court stated only that the defendant school district did not succeed in distancing itself from the religious content of the invocation by "characterizing the individual student as the 'circuit-breaker' in the process," *id.* at 305, 120 S.Ct. 2266; it did not discount the circuit breaker theory altogether. In reaching its conclusion, the Court relied on the specific facts of the case: the students elected whether to deliver an invocation and only then elected a student to deliver the invocation; and the school administration oversaw this two-step process. *Id.* at 306, 120 S.Ct. 2266. Thus, the school administration endorsed the majoritarian decision to have pregame prayer, to the detriment of students in the minority. In contrast, in the context of true private choice, each individual chooses whether to attend the religious programming independently of the majority's preference and that choice is not coerced.

The Department of Corrections funding of Faith Works is unlike the situation in *Santa Fe* in important respects. Offenders under the control of the department choose to participate in Faith Works on an individual basis, rather than as the result of the preference of the majority of offenders. Moreover, as I have already discussed, offenders participating in Faith Works are required to undergo some form of drug or alcohol treatment and Faith Works is recommended to them, but they are told about the religious content of Faith Works, offered a secular alternative and told that they cannot be required to participate in a religious program. In these circumstances, the individual can act as a circuit breaker between the state and the religious program.

Plaintiffs object to the cases cited by defendants and defendant-intervenor in

support of their position, saying that they are inapposite because they do not involve the government's recommendation of a particular religious program. *See, e.g., Zobrest,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (providing interpreter services for deaf student at religious school); *Witters,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (providing vocational assistance to blind person at private Christian college); and *Agostini,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (grants distributed to students directly to pay for tuition at school of students' choice). Plaintiffs argue that in conjunction with *Santa Fe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295, these cases establish the principle that affirmative state action constitutes the endorsement of religion where there is more than the simple redirection of government funds provided to private individuals. Plaintiffs are correct that the offender's role as circuit breaker is less clear cut than cases such as *Zobrest, Witters* or *Agostini.* The offender does not have a wholly unencumbered choice to attend the program. Instead, through its agents, the department recommends Faith Works to offenders. In plaintiffs' view, the state's recommendation of Faith Works is incompatible with the idea of the offender as a "circuit breaker."

Although plaintiffs are correct that the department's recommendation of Faith Works distinguishes the facts of this case from the diversion cases in which the state makes no suggestion regarding where the individual should expend his or her government aid, *see Zobrest,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1; *Witters,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846; and *Agostini,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391, I have already determined that offenders make a genuinely independent, private choice whether to participate in the Faith Works program. Offenders under the custody of the De-

partment of Corrections who are referred to Faith Works are informed of the program's religious content, told that they cannot be forced to participate, given a secular treatment option and allowed to participate in Faith Works only if they consent to its religious content. This genuine choice overrides any element of coercion implied by the state's recommendation of Faith Works. In addition, there is no evidence that offenders are punished or penalized in any way for choosing not to participate in Faith Works. *Cf., Kerr,* 95 F.3d 472 (state could not compel inmate to participate in NA when he suffered negative consequences for objecting to religious content). Finally, the offenders referred to Faith Works are adults and not easily indoctrinated school-age children. *See Schempp,* 374 U.S. at 307, 83 S.Ct. 1560. Taken together, these facts show that agents recommend Faith Works under circumstances that preserve the offenders' genuinely independent, private choice and do not amount to the state endorsement of religion.

 In their final argument, plaintiffs assert that the concept of "informed consent" is meaningless because the department recommends Faith Works in the first instance. Plaintiffs point to the fact that no offenders have objected to the religious content of Faith Works as evidence that offenders do not believe that they can refuse their agent's recommendation. According to plaintiffs, this fact demonstrates the hollowness of the departmental policy of requiring offenders' consent. I disagree. There is a more natural interpretation: the offenders who have participated in Faith Works had no personal objection to its religious nature. This interpretation is borne out by two additional facts. First, probation and parole agents who have recommended Faith Works to offenders believe that those offenders would not have

hesitated to object if they actually did not wish to attend the program. Second, the last two offenders to have participated in Faith Works did not have consent forms in their files. When told that they would have to leave the program, both offenders agreed readily to sign consent forms rather than leave the program.

On the same front, plaintiffs assert that the consent obtained from offenders is not "informed" because of the lack of details provided to offenders regarding both Faith Works and the secular alternatives. The stipulated facts refute this assertion. Faith Works is described to offenders as being nondenominational and willing to work with persons of any faith. Offenders who are referred to the program must acknowledge a willingness to work on their problems in a faith-based program. Offenders who agree to participate in the Faith Works program are then interviewed by staff at Faith Works, where they are also told about the religious component of the program and the expectations for its participants. These facts provide sufficient information about the religious aspects of Faith Works to allow offenders to make an independent, private choice whether to participate in the program.

As a final point regarding informed consent, plaintiffs assert that the fact that the Department of Corrections obtains consent demonstrates that the department is endorsing Faith Works. In other words, plaintiffs argue, the department would not request the offenders' consent if it did not take the step of recommending Faith Works. Like plaintiffs' argument regarding the state's recommendation of Faith Works, this argument fails because I have determined that offenders exercise a genuinely independent, private choice to participate in the program. The fact that offenders are allowed to participate in Faith

Works only if they consent to its religious content is irrelevant to the conclusion that through unencumbered choice, the individual offender breaks the connection between the state funding and the religious program.

I find that offenders participate in the program as a result of their genuinely independent, private choice. Thus, any appearance that the government is endorsing Faith Works is overcome by the fact that offenders must consent to the program's religious content before participating in it. For these reasons, the Department of Corrections' funding of Faith Works does not violate the establishment clause.

## ORDER

I conclude that defendants Scott McCallum, Jennifer Reinert, Richard Gartner, George Lightbourn and Jon E. Litscher and defendant-intervenor Faith Works, Milwaukee, Inc. are entitled to judgment as a matter of law on the claim of plaintiffs Freedom from Religion Foundation, Inc., Anne Nicol Gaylor, Annie Laurie Gaylor and Dan Barker that the Department of Corrections funding of Faith Works violates the establishment clause of the First Amendment to the Constitution. This case is DISMISSED.

The clerk of court is directed to enter judgment in favor of plaintiffs on their claim that the Department of Workforce Development's funding of Faith Works violates the establishment clause of the First Amendment to the Constitution and in favor of defendants and defendant-intervenor on plaintiffs' claim that the Department of Corrections' funding of Faith Works violates the same clause.