**Mark David NUSBAUM, Plaintiff,**

v.

**P.A. TERRANGI, et al., Defendants,**

**Lucky Burrus, Plaintiff,**

v.

**P.A. Terrangi, et al., Defendants.**

**Nos. 2:01CV106, 2:02CV179.**

United States District Court,
E.D. Virginia,
Norfolk Division.

July 19, 2002.

---

George Alfred Rutherglen, University Of Va School Of Law, Charlottesville, VA, Scott William Kezman, Kaufman & Canoles, P.C., Norfolk, VA, for Mark David Nusbaum.

George Alfred Rutherglen, Charlottesville, VA, for Lucky DeWayne Burruss, Jr.

Mark David Nusbaum, Chesapeake, VA, pro se.

William Wayne Muse, Office Of Attorney General Of Virginia, Richmond, VA, for P.A. Terrangi, Warden, L.A. Corner, Ast. Warden of Programs, S. Chris Jones, Ast. Warden of Operations, M. Porcher, Theraputic Community Program Director, Rufus Fleming, defendants.

### OPINION AND FINAL ORDER

FRIEDMAN, District Judge.

Plaintiffs, Virginia inmates, bring this action pursuant to 42 U.S.C. § 1983, to redress an alleged violation of their constitutional rights. These actions, *Nusbaum v. Terrangi*, Action Number 2:01cv106 and *Burrus v. Terrangi*, Action Number 2:02cv179, were consolidated by order filed April 19, 2002, and are before the court on cross-motions for summary judgment. The cross-motions for summary judgment were argued through counsel before this court on April 23, 2002. Plaintiff Nusbaum has moved the court to allow a second amended complaint. As there were no objections by defendants, plaintiff's motion to amend his complaint is **GRANTED.** Plaintiff raises a claim of denial of his rights under the Free Exercise Clause. However, plaintiff has neither presented evidence that he was denied his rights of Free Exercise, nor has he presented any argument to that effect.

### I. FACTS

Plaintiffs are Virginia inmates incarcerated at Indian Creek Correctional Center ("ICCC"). Plaintiffs are required to participate in the Therapeutic Community Program ("Program"). Failure to participate in the Program will result in the loss of good conduct credits and the inability to earn good conduct credits.[1] If an inmate at ICCC does not wish to participate in the Program, there is no alternative way in which that inmate can earn good conduct credits. This court previously addressed the issue of the Therapeutic Community

---

1. Good conduct credits or good time credits are earned by inmates for participation in programs, maintaining good behavior and completion of educational and vocational training. These credits can substantially reduce the length of prison time an inmate serves on a sentence.

Program with respect to the teaching of religion as a coping skill. *Ross v. Keelings*, 2 F.Supp.2d 810 (E.D.Va.1998). Following the court's opinion in *Ross*, a new program was implemented in an attempt to comply with that opinion. The Serenity Prayer was removed from the Program materials and secular alternatives were substituted in many of the materials. However, plaintiffs claim that the revised Program continues to teach "spirituality" and still has certain elements that contain religious references. While the Program materials define spirituality as life enhancing, plaintiffs assert that the distinction is not made in classes.[2] Furthermore, plaintiffs claim that religion and the value of religious beliefs are frequently discussed.

The Program consists of three major components: a morning session, an afternoon session and Smith Hall in the evenings. Each component of the Program is mandatory. If an inmate walks out of a particular session because of objections to religious discussions, the inmate is considered not to be participating in the Program and may be subject to removal. Removal will result in the loss of good conduct allowances and the inability to earn good conduct allowances while housed at ICCC.

There are also support groups that are not mandatory. Two of the support groups are traditional Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") programs with religious compo-nents. However, there are also two secular programs available for those who prefer not to be exposed to religious material. Plaintiffs do not complain about the voluntary, secular support groups.

Plaintiffs have several specific complaints regarding the Therapeutic Community Program as it is currently presented. Plaintiffs claim that Smith Hall, the evening program, teaches the importance of "spirituality." Materials from the traditional AA program are more widely available to inmates. The Program continues to use materials that refer to God.[3] There are frequent discussions of the importance of religion. However, the evidence presented indicates that these discussions are instigated by other inmates rather than staff members. Participants in the mandatory Program are required to watch a video presentation by Michael Johnson which presents elements of the traditional 12–step program of AA. Pl.Ex. 17. The court has reviewed this tape and has determined that one of the primary points of the presentation is that God is the only viable definition of "higher power."[4]

## II.  ANALYSIS

### A.  *Summary Judgment Standard*

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, deter-

---

**2.** In "The Alternative 12 Steps: A Secular Guide to Recovery," the authors define spirituality as something that represents life or enhances life. Pl.Ex. 1 at 26.

**3.** In "A Life Skills Program for Recovery from Addictions: Step 3 Decide to Surrender," the authors suggest that, if the use of "God" or "God as we understand him" is offensive to a participant in a 12–step program, that person should think of "God" as "Good Ordered Direction." Pl.Ex. 2 at 4. "God" is used throughout this document, and participants are urged to turn their lives over to the care of God. *Id.* at 8.

**4.** In "A Life Skills Program for Recovery from Addictions: Step 3 Decide to Surrender," explains that the concept of higher power may be God or "goodness, love, a friend, or an idea." Pl.Ex. 1 at 26. Throughout the materials submitted by the parties as representative of Program materials, participants are urged to turn their lives over to a higher power.

mines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions v. Burlington Indus.,* 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. 2548. Such facts must be presented in the form of exhibits and sworn affidavits. Failure by plaintiff to rebut defendants' motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

In the cases *sub judice* there are cross-motions for summary judgment, thus, the court must look at the facts in the light most favorable to each of the parties in turn.

### B. First Amendment Law

█ The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion ...." U.S. Const. amend. I. It applies to state governments through the Fourteenth Amendment. *Board of Educ. v. Grumet,* 512 U.S. 687, 690, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

A three-prong test first announced by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), is usually used to assess whether government action violates the Establishment Clause. *See, e.g., Mueller v. Allen,* 463 U.S. 388, 394, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (stating that "[t]he general nature of our inquiry in this area has been guided, since the decision in *Lemon v. Kurtzman,* by the 'three-part' test laid down in that case"); *Barghout v. Bureau of Kosher Meat and Food Control,* 66 F.3d 1337, 1341 (4th Cir.1995) (applying *Lemon* ). To pass the *Lemon* test, a government enactment must first "have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; [and] finally, the statute must not foster, 'an excessive government entanglement with religion.'" *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105 (internal citations omitted).

The two Circuit Courts of Appeals that have faced claims and factual circumstances similar to those presented here have declined to apply *Lemon.* Instead, they emphasize the non-voluntariness of the prison program at issue and hold that state action by prison authorities coercing an inmate to attend religious meetings is *per se* unconstitutional. *Warner v. Orange County Dep't of Probation,* 115 F.3d 1068, 1074–75 (2d Cir.1996) (holding that coerced attendance at AA meetings that emphasized religion violates the Establishment Clause); *Kerr v. Farrey,* 95 F.3d 472, 479 (7th Cir.1996) (holding that coerced attendance at NA meetings that emphasized religion violates the Establishment Clause).

This focus on coercion stems directly from the Supreme Court's decision in *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Writing for the majority in *Lee,* Justice Kennedy declined to apply *Lemon* to assess whether school prayer at high school graduation ceremo-

nies violates the Establishment Clause. *Id.* at 587, 112 S.Ct. 2649 (stating that "we do not accept the invitation of petitioners and *amicus* the United States to reconsider our decision in *Lemon v. Kurtzman.*"). Instead, the Court focused on the minimum requirements of the Establishment Clause: "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not *coerce* anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Id.* at 587, 112 S.Ct. 2649 (emphasis added & brackets in original) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 678, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)) (holding that prayer at high school commencement exercise violates the Establishment Clause because students were psychologically coerced to attend).

Furthermore, as a practical matter, a *per se* rule focusing on coercion is a permissible substitute for the traditional *Lemon* test in this context because the mere fact that coercion is exerted by the state is enough to fail the second prong of the test. The second prong of *Lemon* (whether the primary effect is advancing or inhibiting religion) is interpreted and applied to forbid "at the very least, legislation that constitutes an endorsement of one or another set of religious beliefs or of religion generally." *Barghout,* 66 F.3d at 1345 (quoting *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 8, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989)). In other words, "[t]he government must appear neutral in matters of religious significance." *Id.* (citing *Grumet,* 512 U.S. at 696, 114 S.Ct. 2481; *Roemer v. Maryland Pub. Works Bd.,* 426 U.S. 736, 747, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976)). When prison officials coerce an inmate to attend a program teaching religion, the prison officials are certainly endorsing religion over non-religion and are not remaining neutral on matters of religion. Thus,

where coercion is present, the program will inevitably fail the *Lemon* test.

The court in *Ross* applied the *per se* rule adopted by the Second and Seventh Circuits in similar cases. 2 F.Supp.2d at 818. The court concluded that the program would violate the Establishment Clause if (1) the state has acted, (2) the action amounts to coercion, and (3) the object of the coercion is religious. *Id.; see also Warner,* 115 F.3d at 1074–75; *Kerr,* 95 F.3d at 479.

Application of this standard led the court in *Ross* to the conclusion that the Therapeutic Community Program was unconstitutional as it was implemented at ICCC. *Ross,* 2 F.Supp.2d at 818.

### C. Application

Applying the same standard as the court did in *Ross,* this court must conclude that the Therapeutic Community Program continues to violate the Establishment Clause of the First Amendment. ICCC has instituted a mandatory program which implicitly espouses religion. Inmates must participate in the Program or lose good conduct credits and be unable to earn good conduct credits. The Program teaches spirituality and encourages participants to turn their lives over to their "higher power." While spirituality and "higher power" are defined in "The Alternative 12 Steps: A Secular Guide to Recovery," in a secular manner, the overall program blurs this distinction. Pl.Ex. 1 at 26. Furthermore, the Johnson tape, which inmates are exposed to in a required part of the Program, advocates that the only viable definition of "higher power" is God. Finally, God, which participants may interpret as "Good Ordered Direction," is, as defendants concede, inappropriate.

The record has established that discussions regarding the importance of God and religion in conquering addictions is still a

part of the Program. However, these discussions are led by other inmates rather than staff members. It may not be possible, nor even necessary from a First Amendment perspective, to remove all mention of God or religion in discussions related to coping skills and overcoming addictions. Nevertheless, it does not appear from the record that staff members have been intervening to negate any proselytizing.

The Program at ICCC is mandatory. Inmates are required to either participate in the Program or serve a longer time in prison because of the loss of good conduct credits. Therefore, inmates are coerced to participate. While defendants have attempted to remove religion from the mandatory Program, it is clear they have not been entirely successful. As a result, plaintiffs have been coerced by the state to participate in a program that espouses religion. Thus, the Program, as it is currently constituted, continues to violate the Establishment Clause of the First Amendment. However, defendants have claimed that they are entitled to good faith qualified immunity.

*D. Good Faith Qualified Immunity*

■ Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the United States Supreme Court observed:

A necessary concomitant to the determination of whether the constitutional right asserted by the plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all. Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits.

*Id.* at 232, 111 S.Ct. 1789.

The defense of qualified immunity may be a basis for summary judgment if there are no material facts in issue. *Harlow,* 457 U.S. at 815–16, 102 S.Ct. 2727; *see also Torchinsky v. Siwinski,* 942 F.2d 257, 261 (4th Cir.1991) ("[A] particularly appropriate procedure for determining an official's entitlement to qualified immunity is summary judgment."). The United States Court of Appeals for the Fourth Circuit has stated that "[w]here the acts alleged by the plaintiff do constitute a violation of clearly established rights, a defendant is entitled to summary judgment if the record does not create a genuine issue as to whether the defendant in fact committed those acts." *Turner v. Dammon,* 848 F.2d 440, 443 (4th Cir.1988), overruled on other grounds, *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *see also Mensh v. Dyer,* 956 F.2d 36, 39 (4th Cir.1991).

In analyzing qualified immunity, the Fourth Circuit has stated:

[I]t is therefore necessary first to identify the specific constitutional right allegedly violated, then to inquire whether at the time of the alleged violation it was clearly established, then further to inquire whether a reasonable person in the official's position would have known that his conduct would violate that right.

*Collinson v. Gott,* 895 F.2d 994, 998 (4th Cir.1990) (Phillips, J., concurring). While the first two inquiries involve questions of law, *see id.,* "[t]he third, which involves application of *Harlow*'s objective test, may

sometimes require factual determinations respecting a defendant's conduct and its circumstances, but the test's ultimate application is also a matter of law for the court." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *see also Shaw v. Stroud,* 13 F.3d 791, 801 (4th Cir.1994) (reviewing the standard of qualified immunity for prison officials); *Slakan v. Porter,* 737 F.2d 368, 376–77(4th Cir.1984).

### a. The Specific Right

In determining the specific right of the plaintiff that was allegedly violated, the right must not exist in a generalized form, but "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *see also Swanson v. Powers,* 937 F.2d 965, 968 (4th Cir.1991), *cert. denied,* 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992). In determining whether the right was clearly established, "[t]he right must be sufficiently particularized to put potential defendants on notice that their conduct is probably unlawful." *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). As the *Harlow* Court noted, "[i]f the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727.

In the instant case, the right of inmates not to be coerced to participate in religiously based programs was established in *Ross,* 2 F.Supp.2d. at 810. However, in *Wilson v. Layne,* the Court of Appeals for the Fourth Circuit made it clear that, in determining what is settled law for purposes of qualified immunity, a court should ordinarily look to decisions "'by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" 141 F.3d 111, 114 (4th Cir.1998) (en banc)(quoting *Wallace v. King,* 626 F.2d 1157, 1161 (4th Cir.1980)).

In the instant case, there has not been a ruling by either the Court of Appeals for the Fourth Circuit or the Supreme Court on the issue of coercion in the prison context to participate in religiously based therapeutic programs.[5] Nevertheless, this is not an ordinary situation. The decision from the *Ross* court was directed at the same institution involved in this action. The defendants in *Ross* did not appeal. The defendants in this action admit that they made changes in the Therapeutic Community Program in response to the ruling in *Ross.* If the law as to this issue with respect to these particular defendants is not clearly established for qualified immunity purposes, district court rulings would essentially have no practical effect; defendants could continue engaging in practices that have been ruled unconstitutional with impunity from monetary damages. Defendants could simply not appeal decisions by district courts and, thereby, avoid liability to any potential plaintiffs for continuing unconstitutional practices. While it is reasonable to believe that an officer at another Virginia institution might be unaware of the decision in *Ross,* it would strain credulity to assert that the defendants in this action were unaware of that decision.

---

**5.** Although the Court of Appeals for the Fourth Circuit has not had occasion to address this issue, other circuits have ruled on substantially similar cases. The Court of Appeals for the Seventh Circuit ruled that forcing inmates to participate in religious NA program ran afoul of the First Amendment. *Kerr,* 95 F.3d at 480. In *Warner* the Court of Appeals for the Second Circuit found a First Amendment violation where parolee was forced to attend traditional AA meetings as a condition of parole. 115 F.3d at 1074–75.

Having said this, this court need not hold that the law was clearly established in this case, because even assuming, *arguendo*, that the law was clearly established, the defendants conduct was not such that they would necessarily have known they were violating clearly established law.

### b. Conduct of Defendants

The third part of the court's analysis focuses on whether a reasonable officer could have believed that his conduct was lawful. In commenting on the third part of the analysis, the Fourth Circuit stated:

[T]he assessment whether a "reasonable person" in the official's position would have known that his conduct would violate "clearly established" rights must be made on the basis of information actually possessed at the time by the official, or then readily available to him, and in light of the exigencies of time and circumstance in which the official took the action challenged. The tolerance thus accorded by the objective test to "good faith" mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection "to all but the plainly incompetent or those who knowingly violate the law" in order to avoid undue inhibition of public officials in the discharge of their discretionary duties.

*Collinson,* 895 F.2d at 998 (Phillips, J., concurring) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)) (citations omitted); *see also Torchinsky,* 942 F.2d at 261 ("The very idea of reasonableness requires that courts accord interpretive latitude to official judgments. If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost." (citation omitted)).

The conduct in question in this action, is whether defendants continue to coerce inmates to participate in a religiously based program. Basically, if the Program still contains what can be deemed to be coercion to participate in religious activities, would a reasonable officer have believed that their efforts to secularize the Program were sufficient to cease violations of the First Amendment?

Defendants made changes in the Therapeutic Community Program following the decision in *Ross.* Secular non-mandatory support groups were offered as alternatives to the traditional AA and NA programs. The Serenity Prayer has been removed from the Program. The Program no longer overtly espouses religion as a coping skill. The individual defendants do not espouse religion. While it is clear that certain aspects of the Program still contain religious references, this does not automatically leave defendants liable for monetary damages. Essentially, defendants have made what this court finds to be a good faith effort to bring the Program into compliance. This court may not be satisfied that the Program is in compliance, however, a reasonable officer could believe that their efforts were sufficient.

### III. CONCLUSION

Plaintiffs' motion for summary judgment on the issue of liability is **GRANTED** as to the issue of the existence of a violation of the Establishment Clause. However, as no evidence has been proffered with respect to the newly added claim under the Free Exercise Clause, plaintiffs' motion for summary judgment is **DENIED** on the issue of liability for a violation of the Free Exercise Clause. For the reasons stated above, defendants' motion for summary judgment on the issue of good faith qualified immunity is **GRANTED**. Thus, plaintiffs are not entitled to damages. However, plaintiffs have

requested injunctive relief. Because the Program is in violation of the Establishment Clause, defendants' motion for summary judgment on the issue of injunctive relief is **DENIED**.

It is clear that the mandatory Program as constituted continues to violate the Establishment Clause. Therefore, plaintiffs may not be coerced into participating in the Program. Any adverse actions taken against the plaintiffs for their refusal to participate in the Therapeutic Community Program must be expunged. Defendants are **ORDERED** to expunge and otherwise reverse any adverse actions taken against plaintiffs merely because they refused to participate in the Therapeutic Community Program.

In terms of prospective relief, the court will allow plaintiffs and defendants to work together to fashion an appropriate remedy. Obviously, defendants will need to revise the program if they wish to require inmates to participate. Such revision is not necessary as long as the program is voluntary. If defendants remove the religious content from the mandatory portions of Program, plaintiffs may be required to participate and suffer the loss of good conduct allowances if they refuse. However, if defendants choose not to alter the Program, they must provide plaintiffs with an alternative, such as transfer. The record does not establish exactly what entitlement plaintiffs would have to good conduct allowances if they were housed in another facility. However, until such time as the Program ceases to be in violation of the Establishment Clause, plaintiffs must be allowed to earn good conduct credits in the same manner as other inmates in the custody of the Department of Corrections who are not subject to the Program requirement of ICCC. If transfer to another institution is the only viable solution, defendants may, in their discretion, transfer plaintiffs.

Plaintiffs are **DIRECTED** to allow defendants a reasonable time in which to alter the Program or transfer them. If, after a reasonable time, plaintiffs have not been afforded an alternative that does not run afoul of the Establishment Clause, plaintiffs may so inform the court, and the court will fashion a precise remedy at that time.

This action is **ORDERED DISMISSED**, however, plaintiffs are **GRANTED** leave to apply to reopen this action if defendants fail to comply with this Opinion and Final Order within ninety (90) days from the date of this order.

The Clerk is **DIRECTED** to send a copy of this order to counsel for all parties.

IT IS SO **ORDERED**.