# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICKY K. INOUYE,
                              *Plaintiff,*

          and

ZENN K. INOUYE, Personal
Representative of the Estate of
Ricky Kenichi Inouye, aka Ricky
K. Inouye, deceased,
                    *Plaintiff-Appellant,*

          v.

MICHAEL KEMNA; LUCIANNE
KHALAF; DANIEL H. SHIMIZU; PETER
B. CARLISLE; CITY AND COUNTY OF
HONOLULU; MARK NANAMORI,
               *Defendants-Appellees.*

No. 06-15474

D.C. No.
CV-04-00026-DAE

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
June 5, 2007—Honolulu, Hawaii

Filed September 7, 2007
Amended October 3, 2007

Before: David R. Thompson, Marsha S. Berzon, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Tallman

13405

**COUNSEL**

Walter R. Schoettle, Walter R. Schoettle, a Law Corporation, Honolulu, Hawaii, for plaintiff Ricky K. Inouye and Plaintiff-Appellant Zenn K. Inouye. Mr. Schoettle presented oral argument.

Carrie K.S. Okinaga and Marie Gavigan, Corporation Counsel for the City and County of Honolulu, and Moona A. Yost, Deputy Corporations Counsel, Honolulu, Hawaii, for Defendants-Appellees Michael Kemna and the City and County of Honolulu. Ms. Gavigan presented oral argument.

Mark. J. Bennett, Attorney General of the State of Hawaii, and Kendall J. Moser, Deputy Attorney General, Honolulu, Hawaii, for Defendant-Appellee Mark Nanamori. Mr. Moser presented oral argument.

**ORDER**

The opinion filed September 7, 2007 is amended as follows: The first two sentences of the second paragraph of footnote 3 are struck. The amended footnote shall read:

> The prison case, *Inouye v. Cayetano*, Civ. No. 00-00412, began with a complaint filed on June 13, 2000. Nanamori was added to the prison case in the third amended complaint, filed June 8, 2001, which included the First Amendment issues arising from the parole term incidents now before us. Judge Mollway initially held that Nanamori was not entitled to qualified immunity. Inouye moved to dismiss him

from the case soon thereafter, and Nanamori was dismissed. The case was ultimately settled and dismissed on August 12, 2002. Because there was no final judgment on the merits in the case, it has no issue preclusion effects here. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (requiring that proceeding "ended with a final judgment on the merits" for collateral estoppel to apply).

Although a consent judgment may sometimes count as the final judgment required for claim preclusion, 18 A WRIGHT AND MILLER, FEDERAL PRACTICE & PROCEDURE § 4443, *see also Providence Health Plan v. McDowell*, 385 F.3d 1168, 1174 (9th Cir. 2004) (providing standards for claim preclusion), it could not do so in this case because Nanamori and the claims against him had been dropped from the suit before the settlement. In any event, both claim and issue preclusion are affirmative defenses, *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998), and have not been pleaded here.

* * * *

This amendment does not alter the deadline for petitions for rehearing or rehearing en banc in this case. No such petitions have yet been filed and none filed after the original deadline for such petitions will be entertained.

_____

**OPINION**

BERZON, Circuit Judge:

Ricky K. Inouye alleges violations of his First Amendment

rights by his parole officer. He filed this 42 U.S.C. § 1983 action, now carried forward by his son, Zenn K. Inouye ("Zenn"), the personal representative of Inouye's estate.[1]

Inouye charges that Mark Nanamori, his parole officer, violated the Establishment Clause by requiring Inouye to attend Alcoholics Anonymous/Narcotics Anonymous ("AA/NA") meetings as a condition of his parole. The District Court of Hawaii granted summary judgment against Inouye. We now reverse the district court on this claim and remand for further proceedings.[2]

## I.  BACKGROUND

Inouye, who had a methamphetamine addiction and had been sentenced for drug crimes, was released on parole on November 20, 2000. The events of that parole term form the background for this case.

### A.

Inouye had long objected to compelled participation in religion-based drug treatment programs. In June of 2000, while imprisoned, he filed suit against state officials over his placement in such treatment programs in prison.[3]

---

[1]We refer to both the original plaintiff and the present appellant as "Inouye" throughout this opinion, even though Ricky Inouye is now deceased.

[2]Inouye also appeals the district court's grant of summary judgment against him on a Fourth Amendment claim related to a separate incident. We address this portion of his appeal in a memorandum disposition filed concurrently with this opinion.

[3]The prison case, *Inouye v. Cayetano*, Civ. No. 00-00412, began with a complaint filed on June 13, 2000. Nanamori was added to the prison case in the third amended complaint, filed June 8, 2001, which included the First Amendment issues arising from the parole term incidents now before us. Judge Mollway initially held that Nanamori was not entitled to qualified immunity. Inouye moved to dismiss him from the case soon

Inouye then took steps to avoid religion-based drug treatment programs on parole. Just before his release, on November 9, 2000, his attorney sent a letter to the Hawaii Paroling Authority, expressing Inouye's opposition to being placed in a religion-based narcotics treatment program as a condition of his parole. The letter read, in pertinent part:

> Mr. Inouye is a Buddhist. As such, he objects on grounds of the Establishment and Free Exercise Clauses of the First Amendment of the United States Constitution to any state imposed religious practice as a condition of his parole. Enclosed is a copy of the decision in *Kerr v. Farrey*, 95 F.3d 472 (7th Cir. 1996), which holds that the Alcoholics Anonymous 12 step program cannot be imposed by the state as a requirement for eligibility for parole. Mr. Inouye does not object to participating in a substance abuse treatment program. However, he does object to any program that has explicit religious content. This includes, but is not limited to, the recitation of prayers at meetings, whether or not Mr. Inouye is required to participate in the prayer. Please assure that there is no religious content in any substance

---

thereafter, and Nanamori was dismissed. The case was ultimately settled and dismissed on August 12, 2002. Because there was no final judgment on the merits in the case, it has no issue preclusion effects here. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (requiring that proceeding "ended with a final judgment on the merits" for collateral estoppel to apply).

Although a consent judgment may sometimes count as the final judgment required for claim preclusion, 18 A WRIGHT AND MILLER, FEDERAL PRACTICE & PROCEDURE § 4443, *see also Providence Health Plan v. McDowell*, 385 F.3d 1168, 1174 (9th Cir. 2004) (providing standards for claim preclusion), it could not do so in this case because Nanamori and the claims against him had been dropped from the suit before the settlement. In any event, both claim and issue preclusion are affirmative defenses, *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998), and have not been pleaded here.

abuse program that is imposed as a requirement of Mr. Inouye's parole.

Nanamori declared that he was familiar with the contents of Inouye's Hawaii Paroling Authority file. When Inouye was released just over a week after the letter was mailed, Nanamori was appointed as his parole officer. Inouye's conditions of parole gave Nanamori the authority to order him into a drug treatment program. The conditions emphasized that "[f]ailure to participate in your treatment and abide by the rules of the program may be considered evidence that you are refusing to participate in the program." Nanamori did not immediately order Inouye into treatment.

Inouye was arrested for trespassing on March 4, 2001 and tested positive for drug use the next day. At that point, Nanamori ordered him to attend the Salvation Army's Addiction Treatment Services program.[4] The program requires participation in AA/NA meetings, which are rooted, the parties agree, in a regard for a "higher power."

Inouye remained in the program for a few months, but he refused to participate and was terminated from it on June 5, 2001. In part due to Inouye's refusal to participate in the treatment program, Nanamori issued a warrant for Inouye's arrest for parole violations on June 15, 2001, and recommended that his parole be revoked. Inouye's parole was revoked after a hearing on November 7, 2001.

Inouye alleges that his placement in the AA/NA program,

---

[4]Nanamori stated in a declaration that Inouye would have been placed in a different program had he objected to the Salvation Army program. The declaration does not mention the pre-release letter from Inouye's lawyer objecting to religion-based substance abuse programs. In his parole report, Nanamori stated that he "ordered" Inouye to return to the program after Inouye initially "gave [program workers] a hard time and insinuated that he would file suit against them."

and his termination from parole for refusing to participate in the program, violated his First Amendment rights.

**B.**

Two years after these events, on June 6, 2003, Inouye filed suit in state court under 42 U.S.C. § 1983 against Nanamori, among others. On January 16, 2004, the case was removed to federal court.

Nanamori moved for summary judgment. On March 18, 2005, the district court granted Nanamori's motion, holding that he had violated Inouye's First Amendment rights, but had qualified immunity from suit.

During the course of these proceedings, Inouye passed away. His son, Zenn, was named special administrator of Inouye's estate for a six-month term on September 20, 2004 and was substituted as a party on September 29, 2004. Zenn's term expired on March 20, 2005. He was reappointed as personal representative of his father's estate for a three-year term on September 21, 2006.[5] Zenn filed a timely notice of appeal on March 6, 2006.

---

[5]In the period between Zenn's initial term and his second appointment, the defendants in Inouye's Fourth Amendment cause of action filed a motion to dismiss the appeal in this Court. The ground was that we lack jurisdiction because when Zenn filed his Notice of Appeal his term as special administrator had expired, and he had not yet been appointed as personal representative of the estate. As a result, they maintained, Zenn lacked standing.

The motion turns, all parties agree, on the application of Hawaiian probate law. Special administrators are a sub-class of personal representatives, appointed "when necessary to protect the estate . . . prior to the appointment of a general personal representative." HAW. REV. STAT. § 560:3-614 (2006) *see also* HAW. REV. STAT. § 560:1-201 (2006) (defining personal representatives to include special administrators). Personal representatives, more generally, are the parties appointed, sometimes indefinitely, to manage the affairs of an estate. HAW. REV. STAT. § 560:1-201.

## II.  ANALYSIS

This case comes to us on a grant of summary judgment, so our review is de novo, *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007), and we must make all inferences of fact in favor of the nonmoving party, Inouye. *Id.* Doing so, we assume that Inouye's participation the AA/NA program was a compulsory condition of parole. Inouye had objected in advance of parole to such a program but was assigned to participate in one anyway, and was also "ordered" to continue in the program after threatening to sue program officials. There is no evidence that Inouye was ever told that he had a choice of programs. Under these circumstances, a jury could infer that participation was coerced rather than voluntary. We therefore proceed on that premise.

Nanamori does not argue that ordering Inouye to participate in a religion-based drug treatment program was constitutional. Instead, his defense, accepted by the district court, is that the law on the matter was not clearly established at the time he supervised Inouye's parole and that he, therefore, is immune from suit. We hold, on the contrary, that the law was and is very clear, precluding qualified immunity, and on that ground reverse the district court.

---

Hawaiian law supports Zenn's standing and our jurisdiction. As special administrator, Zenn was required to "collect and manage . . . preserve . . . [and] account therefor" the assets of Inouye's estate and had "the power of a personal representative" to do so. HAW. REV. STAT. § 560:3-616 (2006). When his term as special administrator ended, he therefore was bound by HAW. REV. STAT. § 560:3-608 (2006), which specifies that a terminated personal representative may "perform acts necessary to protect the estate and may deliver the assets to a successor representative" and has a "duty to preserve assets subject to [his] control." *Id.* Zenn's actions in the interim period were those necessary to preserve this appeal, which, surely, is an asset of Inouye's estate. Because he had the legal authority and obligation to file the notice of appeal, he had standing even during that period. The motion to dismiss is therefore denied, and the caption of this case is amended to reflect Zenn's present status.

Qualified immunity from civil suit is available to government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We examine a qualified immunity defense with a two-step test: First, we determine whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201. If a constitutional violation is present, we go on to ask "whether the right was clearly established," *id.*, applying an objective but fact-specific inquiry. *Id.* at 202. To reject a defense of qualified immunity, we must find that "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the right." S*aucier*, 533 U.S. at 202; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In making this determination, we consider the state of the law at the time of the alleged violation. *See Blankenhorn,* 485 F.3d at 476; *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002). We also examine the "information possessed" by the officer to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. *Anderson*, 483 U.S. at 641; *Sorrels,* 290 F.3d at 970. The "subjective beliefs" of the actual officer are, of course, "irrelevant." *Anderson*, 483 U.S. at 641.[6]

---

[6]*Skoog v. County of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006), indicated that after *Saucier* step two, we inquire into the reasonableness of the officers' mistake as a third, "final question" in the *Saucier* analysis, 469 F.3d at 1229. Although *Skoog* cites *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001), as support for this proposition, *Jackson* actually refers to this final question as the "*second* inquiry" of the "two-step" analysis under *Saucier*. 268 F.3d at 651 (emphasis added). Neither *Skoog* nor *Jackson* reached even the second step of *Saucier* analysis, both instead finding that no constitutional violation was present at step one. As far as we can tell, *Skoog's* "third" question does not differ from the "second" question of *Jackson* and *Saucier*. In any event, if the two inquiries ever do diverge, they do not do so here, so we use a two-step analysis.

**A.**

In this case, it is essentially uncontested that requiring a parolee to attend religion-based treatment programs violates the First Amendment. We therefore spend relatively little time on the first step of the qualified immunity analysis.

**[1]** Nanamori and Inouye agree that reverence for "a higher power" is a substantial component of the AA/NA program. For the government to coerce someone to participate in religious activities strikes at the core of the Establishment Clause of the First Amendment, whatever else the Clause may bar.[7] As Justice Black wrote in the first modern Establishment Clause case, *Everson v. Board of Education of Ewing Township*, 330 U.S. 1, 15-16 (1947), the clause "means at least" that "[n]either a state nor the Federal Government . . . . can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance." This core holding has consistently been emphasized by the Court. "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *see also Lee*, 505 U.S. at 604 (Blackmun, J., concurring) ("[P]roof of government coercion is not necessary to prove an Establishment Clause violation [but], it is sufficient."); *Zelman v. Simmons-Harris*, 536 U.S. 639, 653 (2002)

---

[7]The basic test for Establishment Clause violations remains that articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971), which requires that government acts (1) not have a "secular legislative purpose," (2) not have a "principal or primary effect" which either "advances [or] inhibits religion," and (3) not foster "an excessive government entanglement" with religion. As the Seventh Circuit noted in *Kerr v. Farrey*, 95 F.3d 472 (7th Cir. 1996)*,* a government mandate to attend religious or religion-based events is clearly barred by the second prong of *Lemon*. *Kerr*, 95 F.3d at 478-79.

(emphasizing importance of the presence of "private choice" to avoid violations of the Establishment Clause).[8]

**[2]** Here, Nanamori is alleged to have required Inouye to attend a program rooted in religious faith and then recommended revoking his parole because he refused to participate. The Second and Seventh Circuits have found compelling prisoners and probationers to participate in AA/NA under similar circumstances unconstitutionally coercive. *See Warner v. Orange County Dept. of Probation*, 115 F.3d 1068 (2nd Cir. 1997), *affirmed by Warner v. Orange County Dept. of Probation*, 173 F.3d 120 (2nd Cir. 1999), *cert. denied sub nom. Orange County Dept. of Probation v. Warner*, 528 U.S. 1003 (1999); *Kerr v. Farrey*, 95 F.3d 472 (7th Cir. 1996).

**[3]** We find the reasoning of the Seventh Circuit in *Kerr* with regard to determining whether there was governmental coercion of religious activity particularly useful. *Kerr* proceeded sequentially as follows: "first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious rather than secular?" *Kerr*, 85 F.3d at 479. We adopt this mode of inquiry and conclude that all three criteria are satisfied here.

**[4]** First, Nanamori acted in his official state capacity as a parole officer to order Inouye into AA/NA. That the state did not run the program itself is "of no moment," *id.* at 479, as the state ordered participation. Second, the action was clearly coercive: Inouye could be imprisoned if he did not attend and he was, in fact, ultimately returned to prison in part because of his refusal to participate in the program.

**[5]** Addressing *Kerr*'s third prong is also quite straightforward. Our record on the content of the AA/NA program here is limited to Inouye's allegations that AA/NA is based in "a

---

[8]In some circumstances, psychological coercion alone can be enough to violate the Clause. *Lee*, 505 U.S. at 593.

higher power." Nanamori does not, however, dispute that the program was substantially based in religion, and presents no evidence that the program differed from the usual AA/NA program, described by the Second Circuit in *Warner* as comprising "intensely religious events," 115 F.3d at 1075, and by the Seventh Circuit in *Kerr* as "fundamentally based on a religious concept of a Higher Power." 95 F.3d at 480. As such, on this summary judgment record and given the lack of dispute between the parties in question, we have no trouble deciding that the third prong of *Kerr*'s Establishment Clause test has been met as well.[9]

**[6]** Hence, we agree with the district court that Nanamori's actions were unconstitutional. While we in no way denigrate the fine work of AA/NA, attendance in their programs may not be coerced by the state.[10] The Hobson's choice Nanamori offered Inouye — to be imprisoned or to renounce his own religious beliefs — offends the core of Establishment Clause jurisprudence.[11]

---

[9]We do not hold that AA/NA is itself a religion. We hold only that, for the purposes of reviewing the grant of summary judgment and on the facts alleged, the AA/NA program involved here has such substantial religious components that governmentally compelled participation in it violated the Establishment Clause.

[10]The confidential nature of AA/NA treatment makes testing efficacy difficult. There is, however, some data to suggest that the programs, as part of a larger treatment strategy, have helped many people maintain their sobriety, at least for a period of time. *See* Max Dehn, *How It Works: Sobriety Sentencing, The Constitution, and Alcoholics Anonymous*, 10 Mich. St. U. J. Med. & L. 255, 269-74 (compiling efficacy data).

[11]There has been some academic suggestion that *Cutter v. Wilkinson*, 544 U.S. 709 (2005) has altered this core jurisprudence. *See* Morris Jenkins, Bradene Moore, Eric Lambert, & Alan Clarke, *DUI Treatment Programs and Religious Freedom: Does* Cutter v. Wilkinson *Change the Analysis?*, 5 U. Md. L. J. Race, Religion, Gender & Class 351 (2005) (Arguing *Cutter* creates space for mandated treatment programs with substantial religious components). We disagree.

*Cutter* upheld a section of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*, against an

## B.

Having held, first, as we must under *Saucier*, that there was a constitutional violation on the facts alleged, we now turn to the question at the heart of the parties' dispute: was the pertinent Establishment Clause law "clearly established" on this point such that a reasonable official would know that his or her conduct was illegal? *Sorrels*, 290 F.3d at 969. We find that it was. The vastly overwhelming weight of authority on the precise question in this case held at the time of Nanamori's actions that coercing participation in programs of this kind is unconstitutional.

[7] In 2001 — indeed, until this case — our Circuit had not ruled on this question. "Absent binding precedent, we look to all available decisional law, including the law of other circuits and district courts, to determine whether the right was clearly established. We also evaluate the likelihood that this circuit or the Supreme Court would have reached the same result." *Osolinksi v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996) (internal citations omitted). While officers cannot be "expected to predict the future course of constitutional law," *Wilson v. Layne*,

---

Establishment Clause challenge. The section barred the government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution" unless that burden was in "furtherance of a compelling government interest" and was the least restrictive means of meeting that interest. 42 U.S.C. § 2000cc-1(a). As such, RLUIPA, as *Cutter* held, was an example of Congressional *accommodation* of prisoners' religious beliefs. 544 U.S. at 719-21. Such accommodation of the free exercise of those beliefs did not violate the Establishment Clause, *id.* at 719. Here, by contrast, we confront the situation where the state mandates that a parolee abandon the free exercise of his beliefs as a condition of parole. The situation is entirely distinct; if anything, RLUIPA and *Cutter* emphasize that prisoners and parolees need not, and ought not be required to, abandon their beliefs when they pass through the gates of the jailhouse. *See* Eric J. Sherbine, Comment, *Does* Cutter v. Wilkinson *Change the Analysis of State-Mandated DUI Programs?: A Critical Response*, 6 U. Md. L. J. Race, Religion, Gender & Class 223 (2006) (emphasizing accommodation/coercion distinction).

526 U.S. 603, 617 (1999), the law may be clearly established even if there is no case directly on point. *Id.* at 615. It is enough if "in the light of pre-existing law the unlawfulness [is] apparent." *Id.*[12] Here, Nanamori need not have relied on more general cases. He had a wealth of on-point cases putting him, and any reasonable officer, on notice that his actions were unconstitutional.

[8] By 2001, two circuit courts, at least three district courts, and two state supreme courts had all considered whether prisoners or parolees could be forced to attend religion-based treatment programs. Their unanimous conclusion was that such coercion was unconstitutional. *See Warner v. Orange County Dept. of Probation*, 115 F.3d 1068, 1074-75 (2nd Cir. 1997) (holding that it was a constitutional violation to impose participation in AA/NA as a probation condition); *Kerr v. Farrey*, 95 F.3d 472, 479-80 (7th Cir. 1996) (same for prisoners); *Alexander v. Schenk*, 118 F. Supp. 2d 298, 301-02 (N.D.N.Y. 2000) (same); *Warburton v. Underwood*, 2 F. Supp. 2d 306, 318 (W.D.N.Y. 1998) (same); *Ross v. Keelings*, 2 F. Supp. 2d 810, 817-18 (E.D. Va. 1998) (same); *Arnold v. Tennessee Board of Paroles*, 956 S.W.2d 478, 483-84 (Tenn. 1997) (AA/NA imposition unconstitutional as a parole condition); *In the Matter of David Griffin v. Coughlin*, 88 N.Y.2d 674, 691-92 (N.Y. 1996) (AA/NA imposition unconstitutional with regard to a prisoner).

We note that this march of unanimity has continued well past March, 2001, when Nanamori acted. Indeed, a district court found a constitutional violation on nearly identical facts just one month later in April, 2001, finding, too, that the law at that time was "clearly established" and no qualified immunity was available. *See Bausch v. Sumiec*, 139 F. Supp. 2d

---

[12]The result in the case before us might well have been the same without any on-point case law, because there is no Supreme Court or Ninth Circuit case, of which we are aware, upholding government-mandated participation in religious activity in any context.

1029, 1037, 1039 (E.D. Wis. 2001).[13] More recent courts have agreed. *See Armstrong v. Beauclair*, 2007 WL 1381790, *12-*13 (slip op.) (D. Idaho Mar. 29, 2007) (noting supporting rulings dating to 1996 and striking down AA/NA requirement as parole condition); *Turner v. Hickman*, 342 F. Supp. 2d 887, 895-97 (E.D. Cal. 2004) (collecting cases and adopting *Kerr* test to bar AA/NA as requirement for release on parole); *Nusbaum v. Terrangi*, 210 F. Supp. 2d 784, 789-91 (E.D. Va. 2002) (holding that there was a violation but finding qualified immunity because defendants were making a good faith effort to come into compliance with the law in prison context). The only case of recent vintage that upheld participation in an AA/NA program, decided in June, 2001, endorsed *Kerr* but held against the plaintiff prison inmate because he had a choice of programs and was not coerced to attend the one he challenged. *In re Garcia*, 24 P.3d 1091, 1096-97 (Wash. Ct. App. 2001). *Garcia* is thus entirely consistent with our holding and with those of all the cases we have cited.

The district court reviewed much of this law before holding that a constitutional violation had occurred. Yet it held, nonetheless, that the law was not clearly established. The court reached this conclusion because it believed that there were a small number of "divergent opinions," even though it noted that a violation had been found "by the majority of federal district courts and state courts," along with the Seventh and Second Circuits. The district court's conclusion was in error, both legally and factually.

First, lack of complete unanimity does not mean that a legal principle has not been clearly established. Second, the "divergent opinions" the district court relied upon totaled three, all

---

[13]Indeed, *Warburton* had concluded that the law was clear and no qualified immunity was available as early as 1998, based upon the decisions available then. 2 F.Supp. 2d at 319. *Schenk* denied qualified immunity in 2000. 118 F.Supp.2d at 302-03. The law had not become any less clear a year later, as *Bausch* shows.

federal district court decisions, and each at least five years old by 2001. Third, as the district court itself noted in its merits discussion, two of these three cases — all except the oldest — are "distinguishable from the instant case in critical ways."

*O'Connor v. California*, 855 F. Supp. 303 (C.D. Cal. 1994), a challenge to AA/NA imposed as part of a sentence for drunk driving, acknowledged that the program was "founded on monotheistic principles" but explained that it was "[s]ignificant to this Court's decision that the individual has a *choice* over what program to attend." *Id.* at 307-08 (emphasis in original). So *O'Connor* does not speak to the coercion issue.

The holding of *Boyd v. Coughlin*, 914 F. Supp. 828 (N.D.N.Y. 1996), which did uphold a coerced program, was abrogated by the Second Circuit in *Warner*, and so was not good law at the time the district court relied upon it as a "divergent opinion." *See Warner*, 115 F.3d at 1074-75.

Of the cases that the district court felt could have caused a reasonable parole officer to be confused about the state of the law, this leaves only *Stafford v. Harrison*, 766 F. Supp. 1014 (D. Kan. 1991).[14] This case, a decade old in 2001, applied the *Lemon* test directly, did not consider the warnings against coercion dating back to *Everson,* and was decided using *Turner v. Safley*, 482 U.S. 78 (1987), deference because it regarded prisoners, not probationers. *Stafford,* 766 F. Supp. at 1016-17. This factually-distinct case, decided before *Lee* reemphasized the dangers of coercion in the Establishment context, simply is not enough to render the state of the law in 2001 anything less than clear.

---

[14]Although it is not cited by the district court or by the parties, we note, for the sake of completeness, that an Illinois appellate court had upheld AA/NA as a sentencing condition in 1988. *See Youle v. Edgar*, 526 N.E.2d 894, 899 (Il. App. Ct. 1988). *Youle* contained a one paragraph analysis and cited no case law. And it, like *Stafford* was decided before *Lee*. It does not weaken our conclusion that the law had become settled by 2001.

**[9]** This uncommonly well-settled case law alone is enough for us to hold that the law was clearly established, sufficient to give notice to a reasonable parole officer, in 2001. But there are additional factual circumstances in this case that persuade us still further. We consider them not for their subjective effect on Nanamori but for their objective effect on a reasonable parole officer in his fact-specific position. *Anderson*, 483 U.S. at 641.

**[10]** First, there was an ongoing federal suit against Hawaii prison officials over mandatory religion-based treatment programs, filed by Inouye, at the time when Nanamori imposed AA/NA as a parole condition. This suit, filed a year prior, focused on the constitutionality of coerced religion-based treatment programs and might well have put a reasonable parole officer on notice, particularly with regard to the very plaintiff in the suit.[15]

**[11]** Second, on the present record, a jury could infer Nanamori had *actual* notice that his actions were unconstitutional, in the form of Inouye's letter to the Hawaii Paroling Authority objecting to such programs and attaching *Kerr*. The district court suggests that *Kerr* did not provide adequate notice because the court there granted qualified immunity, holding that the law was not yet clearly established. But it is *Kerr*, of course, which contributed greatly to establishing the law, and which lays out, convincingly enough to guide any officer facing the question since, why a constitutional violation occurs when AA/NA is simply required, without alternatives. A reasonable parole officer, reading *Kerr* four years after it had been decided, and making the effort to learn that, since it was decided, many courts have agreed with it and none have disagreed, would be put on notice by the decision.

---

[15]Nanamori himself was not added to that suit until after these incidents had occurred. *See supra* note 3.

**[12]** Given all this, Nanamori's mistake as to the law was not reasonable. An officer in Nanamori's position, having available near-unanimous judicial invalidation of religious coercion in this and similar contexts, with a lawsuit in progress against the prison system for mandating participation in a similar program, and having *Kerr* in hand, should not have reasonably repeated the same mistake.

### III.   CONCLUSION

**[13]** We therefore reverse the district court's grant of summary judgment, as Nanamori does not have qualified immunity. The case should go to trial to determine any issues of disputed fact that remain.[16]

### REVERSED and REMANDED.

Defendant-Appellant Nanamori shall bear the costs of this claim on appeal.

---

TALLMAN, Circuit Judge, concurring in the judgment:

I write separately because although I concur in the court's judgment, I cannot embrace the opinion's broad language. The only record evidence in this case that Inouye's participation in Narcotics Anonymous/ Alcoholics Anonymous ("NA/AA") offends the Establishment Clause is a letter that Inouye's attorney wrote on his behalf to the parole board before Inouye's release that simply alleges that NA/AA "has explicit religious content" and encloses a copy of the Seventh

---

[16]We do not decide when, if at all, non-coercive state endorsement or encouragement of participation in AA/NA or other religion-based programs is unconstitutional or when, if ever, a parole officer simply allowing or encouraging, but not requiring, such participation would lose qualified immunity.

Circuit's decision in *Kerr v. Farrey*, 95 F.3d 472 (7th Cir. 1996). We know nothing about the content of the Hawaii Salvation Army's NA/AA program. Indeed, other courts have recognized that the " 'principal and primary effect' of encouraging participation in AA is not to advance religious belief but to treat substance abuse." *O'Connor v. California*, 855 F. Supp. 303, 307 (C.D. Cal. 1994). No one disputes that drug treatment was a necessary condition for Inouye's release on parole. As the opinion correctly notes, however, the parties appear to concede that compelled participation in the NA/AA program at issue here does rise to the level of a First Amendment violation.

Nonetheless, I am concerned that the court's opinion gives parolees incentive to file section 1983 actions when the simple solution would be to return to the sentencing court and seek relief from alleged unconstitutional terms of parole through appropriate motion practice. In fact, Nanamori testified that Inouye never asked to be placed in a different program and that Inouye was terminated from the NA/AA program because he was continuing to use drugs and did not attend any treatment sessions.

Plainly, in this case, completion of a drug treatment program was integral to Inouye's chances for success on parole. Indeed, one of Inouye's parole violations came as a result of his drug-induced conduct at a hotel when he refused to leave after checkout time and for which there was ample probable cause to arrest him. Prisons are filled with offenders who suffer from drug abuse problems. Parole authorities must have the means to require participation in drug treatment programs if the parolee is to have any chance of success and to protect the community from further drug-motivated crimes. *See Warner v. Orange County Dep't. of Prob.*, 115 F.3d 1068, 1077 (2d Cir. 1997) (commenting that the "policy of sending alcoholic defendants like Warner to A.A., . . . was . . . to help free alcoholics from addiction by sending them to a program that has been famously successful").

I also find overstated the court's view of the "reasonable parole officer." It is somewhat of a stretch, as the opinion suggests, to require such officials to closely monitor the state of the law and possess the legal acumen to determine when the fine line of "clearly established" has been crossed and to act accordingly. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) (noting that officials are not "expected to predict the future course of constitutional law"). This suggestion is especially problematic when the parolee's objection to any drug program with questionable religious undertones could have been alleviated by asking for a different program or by filing a simple motion with the sentencing court.

However, because the law was clearly established at the time, Nanamori is not entitled to qualified immunity, and it will be for a jury to decide whether Inouye suffered any compensable damages as a result of being ordered to attend an NA/AA program that he ultimately did not complete, in no small part, because he could not avoid drugs.